Filed 8/8/13 (unmodified opn. attached)

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| POET, LLC et al.,<br><br>     Plaintiffs and Appellants,<br><br>     v.<br><br>CALIFORNIA AIR RESOURCES BOARD et al.,<br><br>     Defendants and Respondents. | F064045<br><br>(Super. Ct. No. 09CECG04659 )<br><br>**ORDER GRANTING REQUEST FOR PUBLICATION AND DENYING REQUEST FOR REHEARING** |

As the entire opinion filed on July 15, 2013, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified, in its entirety, for publication in the Official Reports.

Respondent's request to attach a certified transcript of the May 30, 2013, oral argument to respondent's petition for rehearing is granted.

Respondent's petition for rehearing filed on July 31, 2013, in the above mentioned case is hereby denied.

_____

FRANSON, J.

I CONCUR:

_____

KANE, J.

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| POET, LLC et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>CALIFORNIA AIR RESOURCES BOARD et al.,<br><br>    Defendants and Respondents. | F064045<br><br>(Super. Ct. No. 09CECG04659 )<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County. Jeffrey Y. Hamilton, Jr., Judge.

Wanger Jones Helsley, Timothy Jones, John P. Kinsey, and Daren A. Stemwedel for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Senior Assistant Attorney General, Robert W. Bryne, Gavin G. McCabe, Supervising Deputy Attorneys General, Mark W. Poole, David A. Zonana, and M. Elaine Meckenstock, Deputy Attorneys General, for Defendants and Respondents.

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part V. of the Discussion.

Kahn, Soares, & Conway, Louis A. Brown, and Joshua J. Bettencourt for National Biodiesel Board and California Biodiesel Alliance as Amici Curiae on behalf of Defendants and Respondents.

Shute, Mihaly & Weinberger, Matthew D. Zinn; Timothy J. O'Connor; and Matthew Vespa for American Lung Association in California, Coalition for Clean Air, Conservation Law Foundation, Environmental Defense Fund, and Sierra Club Environmental Law Program as Amici Curiae on behalf of Defendants and Respondents.

J. Nathan Jensen for Clean Energy as Amicus Curiae on behalf of Defendants and Respondents.

Judi K. Mosley for Pacific Gas and Electric Company as Amicus Curiae on behalf of Defendants and Respondents.

-ooOoo-

## **INTRODUCTION**

As part of developing solutions to global warming, the California Legislature adopted the California Global Warming Solutions Act of 2006 (the Act) and established the first comprehensive greenhouse gas regulatory program in the United States. The California Air Resources Board (ARB) is the state agency charged with regulating the sources of emissions of greenhouse gases that cause global warming. The goal of the Act is to reduce greenhouse gas emissions to 1990 levels by 2020, by regulation to establish a statewide cap on greenhouse gas emissions beginning in 2012. California's single largest source of greenhouse gas emissions, which include carbon dioxide and other carbon compounds, is the fuel used for transportation. To reduce the emissions from transportation, ARB adopted a number of regulations, including the Low Carbon Fuel Standards (LCFS) regulations that require the reduction of the carbon content of transportation fuels sold, supplied or offered for sale in California.

ARB's task of creating the LCFS regulations was complex and presented many questions of science, economics and law. ARB's proposed regulations were required to

2.

meet substantive requirements of the Act, procedural requirements for rulemaking in California's Administrative Procedures Act (APA), and substantive and procedural requirements in the California Environmental Quality Act (CEQA). Furthermore, the Act required the LCFS regulations, as well as other greenhouse gas measures, to be in place by January 1, 2010. In sum, ARB was given a difficult task and the pressure of a statutory deadline.

ARB's efforts to complete the LCFS regulations on time satisfied a vast majority of the applicable legal requirements, but ran afoul of several procedural requirements imposed by CEQA and the APA. While these procedural violations are not trivial, they do not require us to automatically discard the existing LCFS regulations and order ARB to restart the complex rulemaking process anew. The statutes in question allow courts to tailor the remedy to the circumstances of each case and, therefore, we may consider the public interests affected by setting aside the LCFS regulations. Those public interests include adverse environmental impacts and, in particular, whether suspending the LCFS regulations would result in more environmental harm than allowing them to remain in effect pending the completion of ARB's corrective action. Because of the potential adverse environmental impacts, as well as other disruptions, we will allow the LCFS regulations to remain operative while ARB complies with the procedural requirements it failed to satisfy. In other words, we will avoid the irony of violations of an environmental protection statute being used to set aside a regulation that restricts the release of pollutants into the environment.

*Summary of Legal Issues and Our Conclusions*

POET, LLC and James M. Lyons (plaintiffs) have challenged the LCFS regulations on the grounds that ARB violated the APA and CEQA during the adoption process. Plaintiffs contend ARB violated the APA by excluding from the rulemaking file made available to the public certain emails from consultants. The emails concerned the computer model ARB used to calculate the indirect carbon emissions attributable to

3.

ethanol due to land use changes caused by the increased demand for the crops used to produce ethanol. Assigning ethanol a higher carbon content based on indirect land use change is controversial because many uncertainties affect the estimates for the land use changes and the carbon emissions resulting from those changes. Also, ethanol is the only biofuel given an increased carbon rating based on land use changes.

Plaintiffs also contend ARB violated CEQA by (1) giving its "approval" to the regulations before the environmental review was complete, (2) splitting the authority to approve or disapprove the regulations from the responsibility of completing the environmental review, and (3) impermissibly deferring the analysis and formulation of mitigation measures for potential increases in the emission of nitrogen oxide (NOx) resulting from the increased use of biodiesel.

We conclude that plaintiffs' APA claim has merit because the emails contain "other factual information" that was "submitted to" ARB and thus are required to be included in ARB's rulemaking file.[1]

Analyzing the CEQA challenges under the independent standard of review, we conclude that ARB prematurely approved the LCFS regulations at its public hearing on April 23, 2009, well before it completed its environmental review. CEQA Guidelines mandate that approval of the LCFS regulations follow completion of the environmental review.[2] We also conclude ARB violated CEQA by splitting the authority between ARB and its Executive Officer (Executive Officer) to approve the project from the

---

[1] This requirement is set forth in subdivision (b)(6) of Government Code section 11347.3.

[2] "Guidelines" refers to the regulations that implement CEQA and are set forth in California Code of Regulations, title 14, section 15000 et seq. Guidelines section 15004, subdivision (a) governs the timing of environmental review relative to a project's approval and Guidelines section 15352 defines "approval." These provisions apply even though ARB conducted its environmental review under a certified regulatory program, rather than using an environmental impact report (EIR). (See Guidelines, § 15250.)

responsibility for completing the environmental review.  Finally, we conclude that ARB violated CEQA by deferring the formulation of mitigation measures for NOx emissions from biodiesel without committing to specific performance criteria for judging the efficacy of the future mitigation measures.  As a result of this failure, ARB failed to qualify for the exception to the general rule prohibiting the deferral of the formulation of mitigation measures.

To remedy these CEQA and APA violations, we direct the trial court to issue a writ of mandate directing ARB to set aside its approval of the subject LCFS regulations while allowing the regulations to remain in effect pending ARB's taking action to comply with the statutes.

We therefore reverse the judgment.

## FACTS

*Initial Legislation*

In 2006, the Legislature passed Assembly Bill No. 32 (AB 32), which became the Global Warming Solutions Act of 2006.  AB 32 is codified at Health and Safety Code sections 38500 through 38599 and requires California's statewide greenhouse gas emissions to be lowered to 1990 levels by 2020.[3]  (Health & Saf. Code, § 38550.)

AB 32 designated ARB as the state agency charged with monitoring and regulating the sources of emissions of greenhouse gases.  (Health & Saf. Code, § 38510.) AB 32 directed ARB to take certain action, such as preparing a "scoping plan" to achieve maximum technologically feasible and cost-effective reduction in global warming,

---

[3]  The term "greenhouse gases" (GHG) is defined by AB 32 to include carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), sulfur hexafluoride ($SF_6$) and nitrogen triflouride ($NF_3$). (Health & Saf. Code, § 38505, subd. (g).)  More generally, greenhouse gases are described as "any gas that absorbs infrared radiation in the atmosphere" and, consequently, also include water vapor, ozone ($O_3$) and hydrochlorofluorocarbons (HCFCs).

5.

adopting measures that could be implemented quickly (i.e., "discrete early action"), and formulating other measures that would require more time to study and implement. AB 32 also imposed timelines for these actions.

The requirements of AB 32 relevant to this appeal concern (1) the scoping plan for reducing greenhouse gases and (2) discrete early action. The scoping plan, which addresses many measures besides the LCFS regulations, includes an overview of standards for lowering the carbon content of transportation fuel. AB 32 required ARB to prepare and approve the scoping plan by January 1, 2009. (Health & Saf. Code, § 38561, subd. (a).) The scoping plan was required to "identify and make recommendations on direct emission reduction measures, alternative compliance mechanisms, market-based compliance mechanisms, and potential monetary and nonmonetary incentives for sources and categories of sources that the [ARB] finds are necessary or desirable to facilitate the achievement of the maximum feasible and cost-effective reductions of greenhouse gas emissions by 2020."[4] (Health & Saf. Code, § 38561, subd. (b).)

The "discrete early action" provisions of AB 32 are relevant because the regulations implementing standards for lowering the carbon content of fuel were early action measures. AB 32 directed ARB, by June 30, 2007, to publish a list of the greenhouse gas emission reduction measures that would qualify as "discrete early action." (Health & Saf. Code, § 38560.5, subd. (a).) Regulations implementing the discrete early actions were to be adopted by January 1, 2010. (Health & Saf. Code, § 38560.5, subd. (b).) This is the deadline ARB attempted to meet in promulgating the regulations governing the carbon content of transportation fuels.

---

[4] ARB's December 2008 scoping plan was previously challenged on the grounds it did not comply with the requirements of AB 32. The challenge was rejected in *Association of Irritated Residents v. State Air Resources Bd.* (2012) 206 Cal.App.4th 1487.

*Low Carbon Fuel Standard (LCFS)*

In January 2007, Governor Schwarzenegger issued Executive Order S-01-07, which (1) set a statewide goal of reducing the carbon intensity of California's transportation fuels by at least 10 percent by 2020, (2) called for the establishment of a LCFS for transportation fuels, and (3) directed the ARB to determine if a LCFS could be adopted as a discrete early action measure pursuant to AB 32.

In September 2007, ARB included a LCFS in its list of nine potential discrete early actions. The list also included measures on the electrification of ships while they were in port, improved landfill methane gas capture, a tire inflation program, and the reduction of PFC's in semiconductor manufacturing.

The scoping plan, eventually adopted in December 2008, included a LCFS that identified transportation as the largest single source of greenhouse gas emissions in California and stated that greenhouse gas emissions could be reduced by improving vehicle efficiency, lowering vehicle miles traveled and reducing the carbon intensity[5] of transportation fuels consumed in California. The scoping plan also stated that the LCFS adopted would provide flexibility to fuel providers in how they meet the requirements and would examine the impacts of the full fuel cycle of transportation fuels.[6] ARB

---

[5] The concept of "carbon intensity" is important to the LCFS regulations. Those regulations define "carbon intensity" as "the amount of lifecycle greenhouse gas emissions, per unit of energy of fuel delivered, expressed in grams of carbon dioxide equivalent per megajoule (gCO2E/MJ)." (Cal. Code Regs., tit. 17, § 95481, subd. (a)(16).) The term "carbon dioxide equivalent" is defined as "the amount of carbon dioxide by weight that would produce the same global warming impact as a given weight of another greenhouse gas, based on the best available science .…" (Health & Saf. Code, § 38505, subd. (c).)

[6] The full fuel cycle or lifecycle sometimes is referred to as "well-to-wheels" for fossil fuels and "seed-to-wheels" or "field-to-wheels" for biofuels. A fuel "pathway," which is considered in establishing the fuel's carbon intensity, consists of all the steps in producing, transporting and using that fuel.

expected the LCFS to transform the state's energy portfolio and move California towards less dependence upon one source of fuel for transportation.

*Rulemaking*

In August 2007, ARB began consulting with the public about a LCFS. In 2008 and early 2009, ARB staff conducted 16 public workshops on proposed LCFS throughout California and participated in numerous meetings with various stakeholders. ARB refers to these meetings, workshops and matters as informal rulemaking activity.

ARB staff used the information gathered during its workshops with the public, as well as its own scientific and technical analysis (which included the use of consultants), in preparing a formal proposal for the LCFS regulations. The proposed regulations were part of the "Staff Report: Initial Statement of Reasons" published on March 5, 2009 (ISOR).

*Carbon Content Standards—Carbon Intensity Values*

The proposed LCFS regulations aimed to achieve a reduction in greenhouse gas emission by establishing performance standards, expressed as carbon intensity values, that fuel producers and importers were required to meet each year beginning in 2011.

For example, for 2011 the standard proposed for gasoline and its replacements was set at 95.61 grams of carbon dioxide equivalent per megajoule or gCO2E/MJ.[7] Each year the standard was reduced and, by 2020, reached 86.27 gCO2E/MJ. The baseline carbon content used in developing the yearly standard for gasoline was derived from reformulated gasoline mixed with corn-derived ethanol.

The other standard for transportation fuels applies to diesel fuel and its replacements. The benchmark for diesel fuel was established using low sulfur diesel fuel.

---

**7** The acronym "gCO2E/MJ" is among those listed in the final regulation. (Cal. Code Regs., tit. 17, § 95481, subd. (b)(13).)

For 2011, the carbon intensity value for diesel fuel and its substitutes was set at 94.47 gCO2E/MJ. By 2020, the standard was reduced to 85.24 gCO2E/MJ.

To determine whether or not a regulated party would meet the yearly standard, the proposed LCFS assigned carbon intensity values for various types of fuels and required the regulated party to calculate the average carbon intensity of all the fuel it provided for that year. The proposed LCFS regulations did not prohibit or require the use of any particular type of fuel. Instead, regulated parties were given the freedom to determine the mix of fuels they would use to meet that the annual standard. When a regulated party came in below the annual standard, credits would be generated and could be sold to other regulated parties or carried over to subsequent years.

The carbon intensity values assigned to particular fuel lifecycles were important to the producers of that fuel, as well as the regulated parties in California, because those values created an incentive or disincentive to use that fuel. For instance, when an alternative fuel has a lower carbon intensity value than the gasoline or diesel benchmark, producers and importers have an incentive to use that alternate fuel as a substitute for the higher carbon intensity fuels they sold in the past. Therefore, the assigned carbon intensity values would ultimately affect the demand and price of that alternative fuel. Controversies arose regarding the carbon intensity values assigned as producers of the various types of fuel vied for favorable terms for their product.

*Lifecycle Analysis*

The carbon intensity value assigned to the various fuels was determined using a lifecycle analysis. This analysis estimates the aggregate quantity of greenhouse gas emissions from all steps in a fuel's lifecycle, including the direct effects of producing and using the fuel, and the indirect effects that may result from the increased production of that fuel. A fuel's lifecycle can be divided chronologically into two stages: (1) all the steps leading up to the delivery of the finished fuel or blendstock into a vehicle's fuel tank and (2) the combustion of the fuel in the vehicle. When the fuel is derived from

9.

crops, the steps occurring before combustion include: (1) farming practices, such as seedbed preparation and fertilizer and pesticide use; (2) harvesting the crop; (3) collecting and transporting the crop to a fuel processing plant; (4) the fuel production process, which involves variables such as the type of fuel used; the energy efficiency of the production technology, and the co-products generated; and (5) the transportation and distribution of the fuel to its end users. Crop yield is another variable that affects the carbon intensity values assigned to a biofuel produced from that crop.

*Fuel Pathways*

Because the steps before combustion are not the same for each specific kind of fuel, the proposed LCFS regulations identified different fuel pathways for estimating the carbon intensity value assigned to that fuel. A fuel pathway consists of all the steps in producing, transporting and using that fuel. One example of different fuel pathways involves ethanol produced in the Midwest using corn and a dry milling process, as compared to a wet milling process. Each milling process produces a distiller's grain co-product. When a plant using the dry milling process dries its distiller's grain co-product, it uses more energy and, thus, the ethanol produced in such a plant is assigned a higher carbon intensity value than ethanol produced in a plant that sells its co-product as wet distiller's grain. Ultimately, the LCFS regulations included 35 different pathways for corn ethanol and six different pathways for sugarcane ethanol.[8]

ARB staff calculated carbon intensity values assigned to a fuel's direct emissions using the Greenhouse Gases, Regulated Emissions, and Energy Use in Transportation model, modified for use in California (CA-GREET). The CA-GREET model is, in essence, a

---

[8] These different pathways and the corresponding carbon intensity values are listed in Table 6 in section 95486 of title 17 of the California Code of Regulations, which is referred to as the "Lookup Table."

very large spreadsheet that performs accounting for greenhouse gas emissions in the calculation of the lifecycle emissions associated with a fuel.

*Land Use Changes*

In addition to the direct emissions associated with producing, transporting and using fuels, the lifecycle analysis considers the indirect effect on greenhouse gases that are caused by a particular fuel. ARB staff identified land use changes resulting from increased use of some crop-based biofuels as a significant source of additional greenhouse gas emissions. Assessing land use changes is based on the idea that a large increase in biofuel demand in the United States will cause land to be converted to farming both in the United States and in countries that trade agricultural products with the United States.[9] Emissions from land use changes were the only indirect effects included for consideration in the proposed LCFS regulations.

ARB staff chose the Global Trade Analysis Project (GTAP) model for assessing the land use change impacts of increased biofuel production levels. ARB's staff's use of the GTAP model was a cooperative effort with researchers from the University of California at Berkeley and Purdue University.[10] The GTAP model was used to estimate the amounts and types of land across the globe that would be converted to agricultural production.

The analyses ARB conducted using the GTAP model resulted in estimates of the carbon intensity component that should be added to ethanol to account for land use

---

[9] Changes in land use affect both carbon storage and the release of greenhouse gases. For example, grassland and forest store carbon at different rates than cropland. A rapidly growing forest can sequester a large amount of carbon both above and below ground. Converting that land to agricultural use disturbs the soil and releases carbon dioxide into the atmosphere.

[10] Consultants from these universities sent emails to ARB regarding the GTAP model. (See fn. 19, *post*.) The nondisclosure of four of these emails is the subject of plaintiffs' APA claim.

changes. Based on these analyses, ARB's staff proposed that 30 gCO2E/MJ be added to the carbon intensity value assigned to each of the 11 different pathways identified for the production of ethanol from corn. These additional 30 units are noteworthy because, before they were added, all 11 pathways had a total carbon intensity value below the 2020 standard set for gasoline and its substitutes. After the addition for the indirect effect of land use change, only two of the pathways had a carbon intensity value below the 2020 standard. Furthermore, the total carbon intensity value of five of the pathways was raised above the 2011 standard of 95.61 gCO2E/MJ. As a result, ethanol from these five pathways would hinder, rather than help, a regulated party comply with the standards set for 2011 and thereafter. The ISOR also proposed to set 46 gCO2E/MJ as the carbon intensity related to land use changes associated with ethanol produced from Brazilian sugarcane.[11]

*45-Day Public Comment Period*

ARB's March 5, 2009, publication of the ISOR started a 45-day public comment period. Along with the ISOR, ARB made available the technical appendices and approximately 10,000 pages of reference materials.

During the comment period, ARB received written comments from stakeholders and other interested parties consisting of nearly 2,100 pages. In addition, written comments presented to ARB during the April 23, 2009, hearing total 290 pages.

*Comments Regarding Emissions from Biodiesel*

One of the controversial positions taken in the ISOR concerned whether the substitution of biodiesel for petroleum-based diesel would increase emissions of NOx. In the ISOR, ARB's staff assumed that there would be no increase in the NOx emissions

---

[11] The final regulation contained many more ethanol pathways. Table 6 in section 95486 of title 17 of the California Code of Regulations includes 35 different pathways for corn ethanol and six different pathways for sugarcane ethanol. The carbon intensity for land use effects remained at 30 and 46 gCO2E/MJ, respectively.

based on the position that, after conducting a test program for biodiesel, ARB would institute regulations setting fuel specifications for biodiesel that would ensure NOx emissions did not increase.

ARB received a number of comments challenging the assumption that biodiesel use would not increase NOx emissions. In response to these comments, ARB reiterated its position that it would "ensure that biodiesel fuel use does not increase NOx emissions significantly by promulgating a new motor vehicle fuel specification for biodiesel."

Additional information regarding biodiesel and the controversy regarding NOx emissions is set forth in part IV.A, *post*.

*Resolution 09-31*

After the close of the comment period, ARB held a public hearing on April 23, 2009. At the close of the hearing, the Board[12] passed resolution number 09-31 (Resolution 09-31) in which the Board approved for adoption[13] the proposed LCFS regulations with certain modifications and designated the Executive Officer[14] of ARB as the decisionmaker for purposes of responding to environmental issues and making further nonsubstantive modifications. More details regarding the contents of Resolution 09-31 and the Executive Officer's role are set forth in part II.D.2, *post*.

---

**12** For purposes of this opinion, the term "Board" is not synonymous with ARB. Instead, "Board" is used narrowly and refers to the group of individuals acting in its capacity as the governing entity of ARB.

**13** As used by the Board in Resolution 09-31, the phrase "approves for adoption" is not the same as "adoption." As used by the Board, "adoption" occurred as a result of the Executive Officer's action in November 2009 and March 2010.

**14** Health and Safety Code section 39515 provides that the Board shall appoint an executive officer and may delegate any duty to the executive officer that the Board deems appropriate. Health and Safety Code section 39516 creates a presumption that powers and duties are delegated to the executive officer unless the Board's minutes show that power or duty was explicitly reserved by the Board for its own action. In this case, some powers were reserved by the Board.

13.

After the hearing, ARB issued a press release stating: "Today, the Air Resources Board adopted a regulation that will implement Governor Schwarzenegger's Low Carbon Fuel Standard calling for the reduction of greenhouse gas emissions from California's transportation fuels by ten percent by 2020." (Underlining omitted.)

Resolution 09-31, establishing the LCFS and adopted for approval on April 23, 2009, included a finding that indirect land use change had been appropriately included in the analysis of the lifecycle of some crop-based biofuels and that excluding the effects of land use change would delay the development of truly low-carbon fuels and jeopardize the achievement of the 2020 goal of a 10 percent reduction in carbon intensity. Resolution 09-31 also approved the Carbon Intensity Lookup Table in section 95486 of title 17 of the California Code of Regulations and gave the Executive Officer the authority to revise the fuel pathways and carbon intensity values set forth in that table, except for the carbon intensity values based on land use changes. Therefore, the 30 and 46 gCO2E/MJ assigned to ethanol from corn and sugarcane, respectively, to account for carbon emissions from land use changes was established by the Board at the April 23, 2009, public hearing and could not have been changed by the Executive Officer.

The Board's actions on April 23, 2009, are important for purposes of this appeal because those actions are the basis for plaintiffs' argument that ARB prematurely approved the LCFS regulations before completing its environmental review and thereby violated CEQA.

*Executive Officer's Actions*

As directed by Resolution 09-31, the Executive Officer incorporated the modifications approved by the Board at the April 23, 2009, hearing, along with appropriate conforming modifications, and made the modifications available for a supplemental comment period of 15 days. The notice of the public availability of the modified text and additional documents was issued on July 20, 2009, and August 19, 2009, was set as the deadline for public comment.

14.

Further modifications to the LCFS regulations were made available to the public in a second 15-day notice dated September 23, 2009.

*Executive Order R-09-014*

On November 25, 2009, the Executive Officer issued Executive Order R-09-014, which adopted the LCFS regulations except for (1) a severability provision that had been inadvertently omitted and (2) provisions regarding the carbon intensity values for biodiesel converted from Midwest soybeans and renewable diesel converted from Midwest soybeans. On the same date, ARB issued a notice of decision and response to significant environmental issues, stating that the executive order had adopted the LCFS regulations and comments raising significant environmental issues had been responded to in an attached Final Statement of Reasons (FSOR).[15]

The LCFS regulations adopted by Executive Order R-09-014 were the subject of a notice of approval of regulatory action issued by the Office of Administrative Law on January 12, 2010. The notice stated that the regulatory action became effective on January 12, 2010, which was only 11 days after the statutory deadline for regulations implementing discrete early action.[16]

*Executive Order R-10-003*

On March 4, 2010, the Executive Officer issued Executive Order R-10-003, which adopted amendments to provisions of the LCFS regulations regarding the matters not included in the initial regulations. ARB also filed a notice of decision with the Resources Agency of California regarding the action taken by Executive Order R-10-003.

---

[15] The FSOR, which is nearly 1,000 pages long, is part of the administrative record.

[16] Health and Safety Code section 38560.5, subdivision (b) sets January 1, 2010, as the deadline for adopting discrete early action measures that reduce greenhouse gases.

On April 15, 2010, the Office of Administrative Law issued a notice of approval of regulatory action approving the amendments to the LCFS regulations concerning the carbon intensity values for biodiesel and renewable diesel fuel made from Midwest soybeans and the severability clause. The notice stated that the regulatory action became effective on April 15, 2010. The LCFS regulations are set forth in sections 95480 through 95490 of title 17 of the California Code of Regulations.

Procedural History

Plaintiffs POET, LLC (POET) and James M. Lyons initiated this litigation on December 23, 2009, by filing a petition for writ of mandate and complaint for declaratory and injunctive relief.[17]

POET produces corn ethanol. In an April 2009 comment letter, POET asserted it was "currently the largest producer of ethanol in the world" and had started its ethanol business in the 1980's in Minnesota. POET currently operates plants across the Midwest from Ohio to South Dakota. POET alleged its ethanol is used in California and the implementation of the LCFS regulations would cause it injury.

James M. Lyons is a California resident who commented on the LCFS regulation, opposed its approval and alleged he would be injured by its implementation without full compliance with CEQA. Lyons is a partner in Sierra Research, which has an office in Sacramento, California. His April 22, 2009, comment letter addressed emission effects of new vehicle purchases involving ultra-low emission vehicles and partial zero emission vehicles.

---

[17] The plaintiffs in this lawsuit are not plaintiffs in the federal lawsuit challenging the LCFS regulations on the grounds that the regulations were preempted by the federal Clean Air Act and the federal Energy Independence and Security Act or violated the dormant commerce clause. (*Rocky Mountain Farmers Union v. Goldstene* (E.D.Cal. 2011) 843 F.Supp.2d 1042.) In the federal lawsuit, the district court granted a preliminary injunction prohibiting the enforcement of the LCFS regulations and the Ninth Circuit Court of Appeals stayed that injunction pending the appeal.

On January 22, 2010, plaintiffs filed a first amended petition and complaint, which is the operative pleading in this case. The pleading named as defendants (1) ARB, (2) James N. Goldstene in his official capacity as the Executive Officer of ARB, (3) Lori Andreoni, in her official capacity as a Manager of ARB, and (4) Ellen Peter, in her official capacity as Chief Counsel of ARB (collectively, defendants). Plaintiffs alleged 25 causes of action for violations of CEQA, the APA and the Health and Safety Code.

Attached to the first amended petition and complaint were many documents that plaintiffs obtained from ARB in response to an August 2009 request for records pursuant to the California Public Records Act, Government Code section 6250 et seq.[18] The attached documents included numerous emails from consultants hired by ARB to assist it in developing the LCFS regulation, including four emails that plaintiffs claim should have been disclosed to the public during the rulemaking process before the hearing on April 23, 2009.[19] Plaintiffs' second and fifteenth causes of action alleged that ARB's exclusion of those emails from the public file documenting its rulemaking activity violated ARB's own regulations and section 11347.3 of the APA.

As to CEQA compliance, the first cause of action alleged CEQA required the decision maker to respond to comments in writing *before* approving a regulation change. The first cause of action also alleged how ARB's delegation to the Executive Officer, staff members and consultants of the responsibility for considering, reviewing and preparing responses to the comments on environmental effects, violated CEQA. Thus,

---

[18] Counsel for plaintiffs submitted the request to ARB in August 2009, which was before the Executive Officer released his responses to the public comments on the proposed regulation or issued Executive Order R-09-014 adopting the first portion of the LCFS regulations. ARB responded to the records request by releasing numerous documents related to the LCFS regulations.

[19] Three of the emails were sent to ARB by Dr. Thomas W. Hertel of Purdue University. The other email was sent to ARB by Richard Plevin, a research scientist at University of California at Berkeley.

the first cause of action challenges both the timing of ARB's approval of the LCFS regulations and the delegation of authority to the Executive Officer.

Plaintiffs' fifth cause of action alleged ARB violated CEQA by (1) failing to mitigate or consider mitigation for increases in NOx emissions caused by the use of biodiesel and (2) impermissibly adjourning for further study any effort to address the potential increase in NOx emissions.

In March 2011, plaintiffs filed their opening brief on the merits in the trial court, along with a declaration that included as attachments a number of emails plaintiffs obtained from ARB pursuant to their Public Records Act request.

In May 2011, ARB filed its brief on the merits and a motion to strike (1) documents attached to the declaration filed in support of plaintiffs' opening brief and (2) documents attached to plaintiffs' pleading. ARB characterized the documents as extra-record evidence and irrelevant.

Following a hearing on the merits of the writ petition and the motion to strike, the trial court filed a statement of decision and ruling on motion to strike on November 2, 2011. The court granted ARB's motion to strike plaintiffs' extra-record evidence, denied plaintiffs' petition for a writ of mandamus, and filed a judgment in favor of ARB.

## DISCUSSION

I.      CEQA AND CERTIFIED REGULATORY PROGRAMS[20]

ARB promulgated the LCFS regulations under a regulatory program certified by the Secretary of Resources as meeting the requirements of section 21080.5. (Guidelines, § 15251, subd. (d) [ARB included in list of certified regulatory programs].) When a regulatory program of a state agency requires the preparation of a plan or other written documentation containing the environmental information specified by CEQA section

---

[20]  All statutory references in parts I through IV and part VI of this opinion are to the Public Resources Code, unless otherwise indicated.

18.

21080.5 and has been certified, the state agency may rely on that plan or other documentation in lieu of an EIR. (CEQA, § 21080.5, subds. (a) & (d)(3).) The rationale for this rule is to avoid the redundancy that would result if environmental issues were addressed in both program-related documents and an EIR. (*San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 551-552.) Stated from a slightly different perspective, regulatory programs are certified when they involve "the same consideration of environmental issues as is provided by use of EIRs and negative declarations." (Guidelines, § 15002, subd. (*l*).)

Because ARB acted under a certified regulatory program, no EIR was prepared and circulated in this case. Consequently, we will provide a brief overview of certified regulatory programs and the rules of law that apply to (1) agency action under such a program and (2) judicial review of that action for CEQA compliance.

A.    Overview of Certified Regulatory Programs

When a regulatory program of a state agency has been certified, action taken under the program "is exempt from Chapter 3 (commencing with Section 21100), Chapter 4 (commencing with Section 21150), and Section 21167, except as provided" in the statutory provisions governing master EIR's.[21] (§ 21080.5, subd. (c).) The practical effect of this exemption is that a state agency acting under a certified regulatory program need not comply with the requirements for preparing initial studies, negative declarations or EIR's. (Guidelines, § 15250; 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2013) § 21.2, p. 1084 (2 Kostka & Zischke).) The agency's actions, however, remain subject to other provisions of CEQA. (Guidelines, § 15250.)

---

**21** Generally, Chapter 3 of CEQA governs the preparation of EIR's by state agencies and Chapter 4 governs the preparation of EIR's by local agencies.

ARB's regulatory program is contained in sections 60005, 60006 and 60007 of title 17 of the California Code of Regulations. These provisions require the preparation of a staff report at least 45 days before the public hearing on a proposed regulation, which report is required to be available for public review and comment. (Cal. Code Regs., tit. 17, § 60005, subd. (a).) It is ARB's policy "to prepare staff reports in a manner consistent with the environmental protection purposes of [ARB's] regulatory program and with the goals and policies of [CEQA]." (Cal. Code Regs., tit. 17, § 60005, subd. (b).) The provisions of the regulatory program also address environmental alternatives and responses to comments to the environmental assessment. (Cal. Code Regs., tit. 17, §§ 60006, 60007.)

B.    Judicial Review

1.    *General Principles Regarding Abuse of Discretion*

Where a public agency has taken quasi-legislative action, such as ARB's approval and adoption of the LCFS regulations, judicial review of that action for compliance with CEQA "shall extend only to whether there was a prejudicial abuse of discretion." (§ 21168.5; see *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426 [review for abuse of discretion] (*Vineyard Area*).) Such an abuse "is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) This statutory language has been interpreted as classifying abuses of discretion into two types of agency error—namely, legal error (the failure to proceed in the manner required by law) and factual error (making findings that are not supported by substantial evidence). (*Vineyard Area*, *supra*, at p. 426.)

Each type of error is subject to a different standard of judicial review. (*Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 101 [in CEQA

matter, appropriate standard of review depends on whether a legal or factual question is being reviewed].)

As to legal error, courts conduct an independent review to determine whether the public agency proceeded in the manner required by law. (*Vineyard Area*, *supra*, 40 Cal.4th at p. 426.) Alternatively, when reviewing an agency's factual determinations for error, courts apply the substantial evidence standard. (*Ibid*.) As a result of the two standards, "a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Id.* at p. 435.)

In accordance with this principle, we will scrutinize each of plaintiffs' CEQA claims to determine whether the alleged defect is predominantly one of improper procedure or a disagreement with the agency's factual findings.

### 2.  *ARB's Approach to Judicial Review and Applicable Law*

The cornerstone of ARB's analysis of the CEQA claims is its certified regulatory program. In ARB's view, the fact it acted under a certified regulatory program plays a key role in determining the applicable standards of judicial review.

With respect to legal error—that is, whether it "has not proceeded in a manner required by law" (§ 21168.5)—ARB contends: "The procedures by which ARB is to be judged are those set forth in its certified regulatory program. (See Pub. Resource Code, § 21080.5(c); *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236.)"

This contention is an incomplete statement of the procedures that ARB must follow to satisfy CEQA. A certified regulatory program is exempt from the procedures regarding the preparation of a negative declaration or EIR, but the "certified program remains subject to other provisions in CEQA such as the policy of avoiding significant adverse effects on the environment where feasible." (Guidelines, § 15250.) Thus, ARB's approach to legal error is unduly narrow because it ignores the procedures in the

21.

"other provisions in CEQA" (*ibid*.) applicable to the action taken by ARB under its certified regulatory program.

Another aspect of the analysis of legal error that is important in this appeal concerns the Guidelines and their role in determining whether ARB failed to proceed in a manner required by law. ARB's respondent's brief contends that "in analyzing compliance with a certified regulatory program, the CEQA Guidelines do not directly apply to the environmental documentation. [Citation.]" This contention appears to be the basis for ARB's failure to cite any Guideline concerning the "other provisions in CEQA" (Guidelines, § 15250) that are applicable to certified regulatory programs. For example, ARB did not cite Guidelines section 15352, which defines the "approval" of a CEQA project or the Guidelines that address the timing of that approval.

To complete the description of ARB's approach to judicial review, we note that ARB also contends that (1) the documents prepared under a certified regulatory program are to be judged under the deferential substantial evidence standard, (2) ARB's substantive determinations are entitled to deference, and (3) this deference extends to its interpretation of statutes and regulations.

### 3. *Our Approach to Judicial Review*

Our inquiry into the standards of judicial review that apply to the CEQA claims presented in this appeal begins with the following basic question: Are the standards of judicial review applicable to agency action taken under a certified regulatory program determined by the same analysis used in other CEQA contexts, such as those involving the preparation of an EIR? We conclude the same analysis is used to determine the appropriate standard of judicial review. (See 2 Kostka & Zischke, *supra*, § 21.1, p. 1084 [standard of review is the same when challenged action was taken under a certified regulatory program].)

Our conclusion is based on the wording of section 21168.5, which refers to "any action or proceeding" challenging an agency decision on the grounds of noncompliance

22.

with CEQA. Plaintiffs' lawsuit clearly qualifies as an "action or proceeding." The statute's use of the word "any" is not qualified and, thus, provides no basis for concluding section 21168.5 does not apply to plaintiffs' CEQA claims. (See *Estate of Lucas* (1943) 23 Cal.2d 454, 465 [statutory reference to "'any claim'" and "'any suit'" construed broadly].) Furthermore, neither section 21168.5 nor any other provision in CEQA expressly excludes decisions made under a certified regulatory program from the standards of judicial review contained in section 21168.5.

Therefore, under the abuse of discretion standard set forth in section 21168.5, we will independently review claims of legal error and apply the substantial evidence standard to claims that ARB committed factual error. Our choice between independent and substantial evidence review is guided by the California Supreme Court's statement that "a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Vineyard Area*, *supra*, 40 Cal.4th at p. 435.) Thus, when plaintiffs' CEQA claim is predominantly one of procedure, we will conduct an independent review. When plaintiffs' CEQA claim disputes the factual findings made by ARB, we will review the record to determine whether the challenged finding is supported by substantial evidence.

II.     PROJECT APPROVAL AND TIMING OF PREPARATION OF CEQA DOCUMENTATION

Our "scrutiny [of] the nature of the alleged defect" (*Vineyard Area*, *supra*, 40 Cal.4th at p. 435) in plaintiffs' first CEQA claim begins with an examination of the parties' contentions and the requirements of CEQA that plaintiffs allege were violated.

A.      Contentions of the Parties

Plaintiffs contend that ARB violated CEQA by approving the LCFS regulations *before* it completed the environmental review process required by CEQA. Plaintiffs reference the definition of "approval" in Guidelines section 15352 and contend that

23.

ARB's "approval" of the LCFS regulations occurred on April 23, 2009, when the Board passed Resolution 09-31.

In response, ARB contends that plaintiffs' argument "rests on a false premise: that ARB completed its rulemaking process at its Board meeting on April 23, 2009." ARB asserts that Resolution 09-31 was merely the initial approval and that the final LCFS regulations were not adopted until November 25, 2009, and March 4, 2010, as reflected in Executive Order R-09-014 and Executive Order R-10-003, respectively. These executive orders were issued after the Executive Officer completed ARB's environmental review process by issuing written responses to public comments. In ARB's view, it fully complied with its certified regulatory program and CEQA because it completed the environmental review before the LCFS regulations became final.

Plaintiffs argue that ARB's position contains legal error because ARB has treated "approval" as occurring when "ARB completed its rulemaking process" or "when the LCFS regulations became final .…" Plaintiffs suggest this legal error occurred because ARB ignored the definition of "approval" contained in Guidelines section 15352 as well as *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116 (*Save Tara*), a Supreme Court case that discussed the application of this definition of "approval."

The parties' contentions can be read as presuming that CEQA requires agencies acting under a certified regulatory program to complete their environmental review before approving their project. Rather than simply joining this presumption, we will set forth the basis for the principle that environmental review must be completed before project approval and discuss how "approval" is defined for purposes of this requirement.

B.      Statutory and Regulatory Provisions

1.      *Timing of Environmental Review and Project Approval*

A certified regulatory program remains subject to the provisions of CEQA outside the scope of the exemption provided by subdivision (c) of section 21080.5. (2 Kostka &

24.

Zischke, *supra*, § 21.11, p. 1093; Guidelines, § 15250.) Thus, certified regulatory programs are subject to CEQA's broad policy goals and substantive standards. (*City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1422; 2 Kostka & Zischke, *supra*, § 21.11, p. 1093.) Those policies and standards include those set forth in the Legislature's declaration of its intent and its declaration of policy. (§§ 21000, 21002; 2 Kostka & Zischke, *supra*, § 21.11, p. 1094.)

The Legislature's declaration of the policy underlying CEQA is contained in section 21002, which provides:

> "The Legislature finds and declares that it is the policy of the state that public agencies should not *approve* projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and that the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects." (Italics added.)[22]

This declaration of policy is supplemented by the Guidelines, which identify the basic purposes of CEQA: "(1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a

---

[22] Section 21002 indicates the importance of the agency's inquiry into alternatives and mitigation measures for the project. The premature approval of a project restricts the consideration of feasible alternatives and mitigation measures and, thus, is not consistent with this policy.

governmental agency approved the project in the manner the agency chose if significant environmental effects are involved."[23]  (Guidelines, § 15002, subd. (a).)

The first three purposes are best served when the environmental review document, such as an EIR or its equivalent, "provide[s] decision makers with information they can use in deciding *whether* to approve a proposed project, not [informs] them of the environmental effects of projects that they have already approved."  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1998) 47 Cal.3d 376, 394.)  When an environmental review occurs after approval of the project, it is likely to become nothing more than a *post hoc* rationalization to support action already taken.  (*Ibid*.)  In short, the policy declaration in section 21002 implies that an evaluation of environmental issues, such as feasible alternatives and mitigations measures, should occur *before* an agency approves a project.

This implication is borne out by CEQA's explicit requirements for EIRs.  Section 21061 addresses the timing of environmental review as it relates to the approval of a project for which an EIR was prepared.  It provides that an EIR "is an informational document which, when its preparation is required by [CEQA], shall be considered by every public agency *prior to its approval* or disapproval of a project."  (§ 21061, italics added.)[24]

---

**23**  Political accountability, informed self-government and environmental protection are promoted by the information and disclosure functions of CEQA. (*Consolidated Irrigation Dist. v. Superior Court* (2012) 205 Cal.App.4th 697, 717.)

**24**  This mandatory language concerning EIR's does not apply in this case.  (See § 21080.5, subd. (a) [certified regulatory program may rely on approved documentation in lieu of an EIR]; Guidelines, § 15251, subd. (d) [ARB listed as a certified program].)  We have included the requirement for EIR's here because it is part of the statutory scheme that establishes the context for the issue raised in this appeal and it provides a point of comparison.

CEQA does not explicitly address the timing of project "approval" when the environmental review is contained in documents generated under a certified regulatory program. The Guidelines, however, do address this question. Specifically, Guidelines section 15004, subdivision (a) states: "Before granting any *approval* of a project subject to CEQA, every lead agency or responsible agency shall consider a final EIR or negative declaration or *another document authorized by these guidelines to be used in the place of an EIR* or negative declaration. See the definition of 'approval' in Section 15352." (Italics added.)

We conclude that the phrase "another document authorized by these guidelines to be used in place of an EIR" (Guidelines, § 15004, subd. (a)) includes "a plan or other written documentation containing environmental information" referred to in section 21080.5 and prepared under a certified regulatory program. Such a plan or document "may be submitted in lieu of [an EIR]." (§ 21080.5, subd. (a); see Guidelines, § 15252 [document of certified regulatory program used as substitute for EIR].) Therefore, we conclude that the timing requirement set forth in Guidelines section 15004, subdivision (a) applies to the environmental review documents prepared by ARB in this case—that is, the staff reports and written responses to comments that ARB used in lieu of an EIR. (See Cal. Code Regs., tit. 17, §§ 60005, subd. (a) & 60007.)[25]

Guidelines section 15004, subdivision (b)[26] addresses the requirement that the CEQA documents be considered *before project approval* by setting forth the general

---

[25] California Code of Regulations, title 17, section 60007, subdivision (a) provides "If comments are received during the evaluation process which raise significant environmental issues associated with the proposed action, the staff shall summarize and respond to the comments either orally or in a supplemental written report. Prior to taking final action on any proposal for which significant environmental issues have been raised, the decision maker shall approve a written response to each such issue."

[26] Portions of subdivision (b) of Guidelines section 15004 reads:

principle that "[c]hoosing the precise time for CEQA compliance involves the balancing of competing factors." The next sentence explains this balancing process by stating that "EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment."[27] (Guidelines, § 15004, subd. (b).)

The requirement that the CEQA document be considered before project approval is reflected in the corollary that "public agencies shall not undertake actions concerning the proposed public project that would have a significant adverse effect or limit the choice of alternatives or mitigation measures, *before completion of CEQA compliance.*" (Guidelines, § 15004, subd. (b)(2), italics added.) To illustrate this point, the Guidelines state that a public agency shall not "take any action which gives impetus to a planned or foreseeable project in a manner that forecloses alternatives or mitigation measures that

"Choosing the precise time for CEQA compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment. [¶]…[¶]

"(2) To implement the above principles, public agencies shall not undertake actions concerning the proposed public project that would have a significant adverse effect or limit the choice of alternatives or mitigation measures, before completion of CEQA compliance. For example, agencies shall not: [¶]…[¶]

"(B) Otherwise take any action which gives impetus to a planned or foreseeable project in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project."

**27** Construed literally, this sentence does not apply in this case because it does not mention environmental review documents prepared in lieu of an EIR.

28.

would ordinarily be part of CEQA review of that public project." (Guidelines, § 15004, subd. (b)(2)(B).)

In closing our overview of the timing requirement, we will consider an argument that might be implied from (1) ARB's position that the Guidelines are not directly applicable to its environmental review documents and (2) ARB's failure to mention or even cite Guidelines section 15004. ARB might be of the view that the timing requirement in subdivision (a) of Guidelines section 15004 does not apply to its action in promulgating the LCFS regulations.

We reject this position. Instead, we conclude that certified regulatory programs, while exempt from certain requirements of CEQA, are not exempt from the timing requirement in Guidelines section 15004. Our conclusion is based on the language used in subdivision (a) of Guidelines section 15004, which extends beyond EIRs and includes other documents authorized for use in place of EIRs. In addition, the timing requirement is derived from the Legislature's policy declaration in section 21002,[28] a provision of CEQA that applies to certified regulatory programs. The policy of environmental review of feasible alternatives and mitigation measures makes practical sense only if that review occurs before an agency approves a project. (*Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 47 Cal.3d at p. 394.) Otherwise, the review is likely to be a *post hoc* rationalization. (*Ibid*.)

### 2. Definition of "Approval"

The parties disagree over when ARB is deemed to have approved the LCFS regulations. Our analysis of this issue begins with the definition of the word "approval."

---

**28** "[P]ublic agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects." (§ 21002.)

The word "approval" and variants such as "approve" appear in both CEQA and the Guidelines, but CEQA itself does not define these terms. Guidelines section 15352, subdivision (a) however, define "approval" as follows:

> "'Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person. The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances. Legislative action in regard to a project often constitutes approval."

For purposes of this case, we will apply the definition of "approval" set forth in subdivision (a) of Guidelines section 15352.

ARB's appellate brief lacks any mention of Guidelines section 15352 or the case law applying its definition of "approval." At oral argument, counsel for ARB argued that the second sentence of the definition of "approval" regarding the "exact date of approval" supports the conclusion that the LCFS regulations were not approved for purposes of CEQA until the Executive Officer took final action. We reject this argument. First, ARB has not adopted a rule or regulation that identifies the exact date when approval occurs for purposes of CEQA. Second, the ARB regulation that states the decision maker shall approve a written response to each significant environmental issue raised "[p]rior to taking final action on any proposal" does not, in our view, establish that "approval" for purposes of CEQA occurs when the decision maker takes "final action." (See Cal. Code Regs., tit. 17, § 60007, subd. (a).)

Thus, we conclude that the definition of approval contained in Guidelines section 15352 applies even though ARB acted under a certified regulatory program. As a result, we must determine when ARB made the decision that committed it to a definite course of action in regard to the LCFS regulations.

C.      Judicial Review

Whether we conduct an independent review or apply the substantial evidence standard depends on "the nature of the alleged [CEQA] defect." (*Vineyard Area*, *supra*, 40 Cal.4th at p. 435.) We must determine "whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Ibid.*)

The California Supreme Court's position on the standard of review applicable to the question of the timing of project approval relative to the environmental review is set forth in *Save Tara*, *supra*, 45 Cal.4th 116. *Save Tara* involved a city's agreement to sell land and allow private development of that land so long as the developers complied with CEQA. The Supreme Court considered whether entry into that agreement constituted "approval" of the project and, thus, was required to be preceded by the preparation of an EIR. (*Save Tara, supra,* at p. 121.) The court concluded that "the City of West Hollywood's conditional agreement to sell land for private development, coupled with financial support, public statements, and other actions by its officials committing the city to the development, was, for CEQA purposes, an approval of the project .…" (*Id*. at pp. 121-122.) As to the standard of review, the court determined "that postponement of an EIR until after the project approval constitutes procedural error that is independently reviewable .…" (*Id*. at p. 131, fn. 10.)

D.      Analysis of When Approval Occurred

1.      *Principles Governing the Inquiry into Approval*

The Supreme Court's decision in *Save Tara*, *supra*, 45 Cal.4th 116 is the leading case regarding the application of the definition of "approval" contained in Guidelines section 15352. (See *City of Santee v. County of San Diego* (2010) 186 Cal.App.4th 55, 61 [*Save Tara* provides "significant and controlling elaboration" of the definitions of "approval" and "project"].) The legal question we must decide is whether the general principles set forth in *Save Tara* regarding the application of the definition of "approval" should be extended to the instant case. We conclude they should.

31.

There are two main differences between the situation presented in *Save Tara* and the facts of the instant case. First, *Save Tara* involved a project that would be completed by *private parties*. Here, the project is being carried out by ARB, a public agency. Second, the environmental review document prepared for the project in *Save Tara* was an EIR. Here, there is no EIR because the implementation of the LCFS regulations is being accomplished under a certified state regulatory program. We conclude that the general principles regarding "approval" set forth in *Save Tara* should be extended to projects undertaken by public agencies under certified regulatory programs. Our conclusion is based on the text of the regulatory definition and the fundamental policies underlying CEQA.

Subdivision (a) of Guidelines 15352 states: "'Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." This definition explicitly refers to projects "to be carried out by any person." The term "any person" is broad and includes both public entities and private parties. Therefore, the definition of "approval" in subdivision (a) of Guidelines section 15352 applies to both public and private CEQA projects.

Furthermore, nothing in the definition of "approval" suggests that it is limited to situations involving EIR's or otherwise does not extend to projects subject to environmental review under a certified regulatory program. Other provisions in the Guidelines indicate the definition of approval does not change when a certified regulatory program is involved. Specifically, Guidelines section 15004, subdivision (a) includes a cross-reference to Guidelines section 15352 and the definition of "approval" and sets forth the principle that documents prepared in place of an EIR (such as those prepared under a certified regulatory program) shall be considered before granting any approval to the project.

The legislative policy considerations important to the timing of environmental review were identified by the Supreme Court in the following paragraph:

> "This court, like the CEQA Guidelines, has thus recognized two considerations of legislative policy important to the timing of mandated EIR preparation: (1) that CEQA not be interpreted to require an EIR before the project is well enough defined to allow for meaningful environmental evaluation; and (2) that CEQA not be interpreted as allowing an EIR to be delayed beyond the time when it can, as a practical matter, serve its intended function of informing and guiding decision makers." (*Save Tara*, *supra*, 45 Cal.4th at p. 130.)

The intended function of the environmental review documents prepared under a certified regulatory program in lieu of an EIR is the same as that served by an EIR. (See Guidelines, § 15002, subd. (a) [basic purposes of CEQA].) Regulatory programs are certified when they involve "the same consideration of environmental issues as is provided by the use of EIRs and negative declarations." (Guidelines, § 15002, subd. (*l*).)

To inform and guide decision makers, these documents must be considered before approval of the project. (See *Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 47 Cal.3d at p. 394 [when environmental review occurs after approval of the project, it is likely to become nothing more than a *post hoc* rationalization to support action already taken].) The "same consideration of environmental issues" (Guidelines, § 15002, subd. (*l*)) would not occur under a certified regulatory program if the environmental review documents were not completed until after the project was approved.

In summary, nothing in the text of CEQA, the Guidelines or the underlying purposes of CEQA leads us to conclude that different timing considerations should be applied to environmental review conducted under a certified regulatory program. Regardless of context, it is a matter of commonsense that decisionmaking is aided when information is received prior to the decision, not after it is made. Thus, we will apply the

33.

general principles set forth in *Save Tara* regarding the application of the definition of "approval" to the facts of this case.

The next legal question we address concerns the conditions set forth in Resolution 09-31, adopted on April 23, 2009, and how those conditions affect when the approval occurred.

In *Save Tara*, *supra*, 45 Cal.4th 116, the city council approved an agreement to sell land to private developers that included a predevelopment loan to the developers of nearly half a million dollars. (*Id*. at p. 124.) The agreement required the satisfaction of certain conditions, including that the developers take the actions necessary to comply with CEQA. (*Save Tara, supra,* at p. 124.) The existence of this condition led the Supreme Court to address "whether an agency may delay EIR preparation by making its final approval of a project contingent on subsequent CEQA compliance, while otherwise agreeing to go forward with the project." (*Id*. at p. 128.) Similarly, the present case presents the question whether the CEQA compliance conditions contained in Resolution 09-31 affected when the "approval" of the LCFS regulations occurred.

In *Save Tara*, the city and developers argued that a CEQA compliance condition in an agreement to convey or develop property eliminated the need for the preparation of an EIR. (*Save Tara*, *supra*, 45 Cal.4th at p. 132.) In contrast, the plaintiffs argued that a CEQA compliance condition never should postpone environmental review. The Supreme Court rejected the bright-line rules proposed by the litigants, stating that neither position was "consistent with CEQA's interpretation and policy foundation." (*Save Tara*, *supra*, at p. 138.) Instead, the court adopted a position that requires a case-by-case analysis:

> "A CEQA compliance condition can be a legitimate ingredient in a
> preliminary public-private agreement for exploration of a proposed project,
> but if the agreement, viewed in light of all the surrounding circumstances,
> commits the public agency as a practical matter to the project, the simple
> insertion of a CEQA compliance condition will not save the agreement
> from being considered an approval requiring prior environmental review."
> (*Id*. at p. 132.)

34.

The court's position was consistent with "the general principle that before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' (Cal. Code Regs., tit. 14, § 15004, subd. (b)(2)(B); [citations]." (*Save Tara*, *supra*, 45 Cal.4th at p. 138.) The general principle set forth in subdivision (b)(2)(B) of Guidelines section 15004 is not, by its terms, limited to projects involving EIR's and, therefore, we conclude that it also applies to projects that are subject to environmental review under a certified regulatory program. Thus, we conclude the Supreme Court's statements regarding conditional development agreements can be applied to ARB's resolutions concerning the LCFS regulations. Accordingly, in the following quote from *Save Tara*, we have replaced the references to conditional development agreements with references to the resolutions of ARB.

> "In applying this principle to conditional [resolutions of ARB], courts should look not only to the terms of the [resolution] but to the surrounding circumstances to determine whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project. [Citation.] In this analysis, the [resolution's] conditioning of final approval on CEQA compliance is relevant but not determinative." (*Save Tara*, *supra*, 45 Cal.4th at p. 139.)

Our application of the foregoing principle to the present case will involve an examination of the terms of the resolution passed by the Board as well as the surrounding circumstances to determine whether the ARB, as a practical matter, committed itself to the LCFS regulations, or any particular feature of those regulations, at the April 23, 2009, public hearing, so as to effectively "preclude any alternatives or mitigation … including the alternative of not going forward with the project…." (*Save Tara, supra,* 45 Cal.4th at p. 139.)

35.

## 2. *Application of Principles to Facts of this Case*

Plaintiffs' position that the ARB approved the LCFS regulations on April 23, 2009, is based on (1) the wording of documents created by ARB and (2) the practical effect of the provisions in Resolution 09-31.

Plaintiffs cite documents created by ARB that state the LCFS regulations were either "approved" or "approved for adoption" at the April 23, 2009, public hearing. Plaintiffs argue that these statements amount to an admission that, for purposes of CEQA, the Board gave its "approval" to the LCFS regulations at the April 2009 hearing.

As to the practical effect of the resolutions passed by the Board at the April 23, 2009, hearing, plaintiffs' argument is based on the wording of those resolutions and the way they were implemented. Plaintiffs contend that, before the environmental review was completed, the resolutions effectively foreclosed the consideration of alternatives and mitigation, "including the alternative of not going forward with the project" (*Save Tara*, *supra*, 45 Cal.4th at p. 139).

Before describing ARB's documents that plaintiffs' claim show the LCFS regulations were approved at the April 23, 2009, hearing, we will address whether those documents are relevant to the inquiry regarding when approval occurred. In *Save Tara*, *supra*, 45 Cal.4th at page 139, the Supreme Court stated that courts should look to the surrounding circumstances to determine whether the agency committed itself to the project. We conclude the relevant "surrounding circumstances" include documents in which the public agency has described its actions regarding the project, especially where those documents are released to the public. For instance, in *Save Tara,* the city's public announcements were part of the evidence that demonstrated the city had committed itself to a definite course of action regarding the development project. (*Id*. at p. 142.)

Plaintiffs have cited a number of documents prepared by ARB, including (1) the notice of the Board's public hearing on April 23, 2009, (2) Board Resolution 09-31, (3)

ARB's press release issued on April 23, 2009, and (4) the notices of decision filed with the Resources Agency of California.[29]

The notice of public hearing regarding the LCFS regulations stated that ARB "will conduct a public hearing at the time and place noted below *to consider adoption* of a regulation to implement the Low Carbon Fuel Standard (LCFS)." (Italics added.)

At the end of the public hearing on April 23, 2009, the Board passed Resolution 09-31, which included the following provisions:

> "NOW, THEREFORE, BE IT RESOLVED that the Board *hereby approves for adoption* new sections [of the LCFS regulations] as set forth in Attachment A hereto, with the modifications described in Attachment B hereto.

> "BE IT FURTHER RESOVLED that the Board directs the Executive Officer: (1) to incorporate into the approved regulations and incorporated document the modifications described in Attachment B hereto and such other conforming modifications as may be appropriate; (2) to make the modified regulations (with the modifications clearly identified) and any additional documents or information available for public comment for a period of at least 30 days; (3) to consider any comments on the modifications received during the supplemental comment period; and then (4) either to adopt the regulations as made available with any appropriate additional nonsubstantial modifications, to make additional modifications available for public comment for an additional period of at least 15 days, or to present the regulations to the Board for further consideration if he determines that this is warranted."

After the hearing, the ARB issued a press release stating: "Today, the Air Resources Board adopted a regulation that will implement Governor Schwarzenegger's

---

**29** When an agency acting under a certified regulatory program files a notice of decision that complies with section 21080.5, subdivision (d)(2)(E), a 30-day statute of limitations begins to run. (Guidelines, § 15112, subd. (c)(3).)

Low Carbon Fuel Standard calling for the reduction of greenhouse gas emissions from California's transportation fuels by ten percent by 2020." (Underlining omitted.)[30]

The November 25, 2009, notice of decision related to the LCFS regulations and issued by the ARB included the following two lines:

"Approved by:                Resolution 09-31

"Adopted by:                Executive Order R-09-014"

The notice of decision also stated that "[c]omments raising significant environmental issues have been responded to in the Final Statement of Reasons (Attached)."

A subsequent notice of decision filed with the Resources Agency of California on March 4, 2010, relating to modifications to the LCFS regulations included the following lines:

"Approved by:                Resolution 09-31

"Adopted by:                Executive Order R-10-003"

Each of the notices of decision states that the LCFS regulations were approved by Resolution 09-31, which the Board passed on April 23, 2009.

Plaintiffs also refer to an update regarding the LCFS regulations that ARB released in October 2009, which stated: "On April 23, 2009, the California Air Resources Board (ARB/Board) *approved* the Low Carbon Fuel Standard (LCFS) for transportation fuels in used in California." (Italics added.) The update also stated: "The Board-*approved* revisions to the regulation are undergoing public review and as such are subject to change." (Italics added.)

---

[30] Before their vote on Resolution 09-31, ARB members described their action on April 23, 2009, as "historic."

We conclude that these documents show the LCFS regulations had significant bureaucratic momentum after they were approved for adoption by the Board on April 23, 2009. ARB's press release stated that the Board "adopted a regulation that will implement Governor Schwarzenegger's Low Carbon Fuel Standard .…" The phrase "adopted a regulation" describes what happened in the past and the phrase "*will implement* Governor Schwarzenegger's Low Carbon Fuel Standard" describes ARB's view of what will happen in the future. This unqualified public statement about the future "increased the political stakes" (*Save Tara*, *supra*, 45 Cal.4th at p. 135) and left little doubt that ARB was committed to implementing the LCFS regulations as a result of the action taken by the Board on April 23, 2009.

Next, we examine the terms of the resolutions passed by the Board on April 23, 2009, "to determine whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures .…" (*Save Tara*, *supra*, 45 Cal.4th at p. 139.)

Plaintiffs argue that the terms of Resolution 09-31 committed ARB to particular features of the LCFS regulations because, among other things, the Executive Officer was not authorized to decline to implement the regulation—that is, he could not choose "the alternative of not going forward with the project." (*Save Tara*, *supra*, 45 Cal.4th at p. 139.)

Plaintiffs' argument accurately characterizes the authority of the Executive Officer. The Board required the Executive Officer "either [(a)] to adopt the regulations as made available with any appropriate additional nonsubstantial modifications, [(b)] to make additional modifications available for public comment for an additional period of at least 15 days, or [(c)] to present the regulations to the Board for further consideration if he determines that this is warranted." Under this grant of authority, the Executive Officer could not scrap the LCFS regulations and begin anew based on information learned during his environmental review. The most he could do was decline to adopt the

regulations and refer them back to the Board, an option that was not practical in view of the January 1, 2010, deadline set for discrete early action regulations by Health and Safety Code section 38560.5, subdivision (b).

The Board also gave the Executive Officer the authority to "add new or customized fuel pathways and carbon intensity values to the Carbon Intensity Lookup Table in section 95486, [and] revise any existing fuel pathway or carbon intensity value (*except* values based on land use or other indirect effects that are specified in the Carbon Intensity Lookup Table in section 95486 as adopted in this rulemaking) .…" (Italics added.) Plaintiffs argue the stated exception prohibited the Executive Officer from modifying the 30 gCO2E/MJ added to the carbon intensity value of ethanol produced from corn to account for indirect effects from land use changes and, thus, demonstrates that the Board was committed to particular features of the LCFS regulation as approved at the April 23, 2009, public hearing. We agree. The Board's resolution effectively precluded the Executive Officer from adopting alternatives to the carbon intensity values based on land use or other indirect effects.[31]

Based on the foregoing and the absence of any analysis of Guidelines section 15352 and *Save Tara* in the appellate briefing submitted on behalf of ARB, we conclude that ARB committed itself to a definite course of action regarding the LCFS regulations when it passed Resolution 09-31 and issued the related press release on April 23, 2009. Therefore, we conclude April 23, 2009, is the date of ARB's "approval" of the LCFS regulations for purposes of Guidelines section 15352 and CEQA.

Lastly, we discuss ARB's argument that because plaintiffs are "mistaken about when the LCFS regulations became final, their argument fails." This argument assumes

---

[31] As discussed earlier in this opinion, a significant portion of the carbon intensity values assigned to ethanol pathways is intended to represent the greenhouse gas emissions attributable to land use changes caused by increased demand for ethanol. (See fn. 11 and accompanying text, *ante*.)

that the critical date is when the regulations became final. This assumption is wrong and cannot be squared with the statements about finality made by the Supreme Court in *Save Tara*, *supra*, 45 Cal.4th 116.

In *Save Tara*, the city's "final approval" of the project was contingent upon subsequent CEQA compliance. (*Save Tara*, *supra*, 45 Cal.4th at p. 128.) The court addressed the finality aspect of approval by stating: "Just as CEQA itself requires environmental review before a project's approval, not necessarily its *final* approval [citations], so the guideline defines 'approval' as occurring when the agency *first* exercises its discretion to execute a contract or grant financial assistance, not when the *last* such discretionary decision is made." (*Id.* at p. 134.)

Consequently, ARB's assertion that the "final LCFS regulation as modified was not adopted until November 25, 2009, in Executive Order R-09-014, and March 4, 2010, in Executive Order R-10-003" might be a proper use of the word "final." But, the concept of finality has little impact on the relevant legal question concerning when "approval" occurred. (See Guidelines, § 15352.)

E. Postapproval Environmental Review Violated CEQA

The fact that the environmental review under ARB's certified regulatory program had not been completed by April 23, 2009, is not disputed by ARB. The incompleteness is illustrated by, among other things, the following sentence in the resolutions passed by the Board on April 23, 2009: "The Executive Officer is the decision maker for the purposes of title 17, California Code of Regulations, section 60007 and responding to environmental issues raised on the proposed regulation, and by approving this Resolution 09-31, the Board is not prejudging any of the responses that will be made by the Executive Officer to these environmental issues." This resolution plainly indicates that part of the environmental review under the certified regulatory program (i.e., response to comments) would occur after April 23, 2009.

41.

Based on the fact that the environmental review was not finished when ARB "approved" the project on April 23, 2009, it follows that ARB violated CEQA's requirement that project approval must occur *after* the public agency has considered the environmental review documentation prepared to satisfy CEQA. (See Guidelines, § 15004, subd. (a) [agency shall consider environmental review document before granting any approval].)

III.    SPLITTING DECISIONMAKING AUTHORITY

A.    Contentions of the Parties

Plaintiffs' second CEQA claim concerns *who* approved the project and whether the required environmental review was done by someone who could act as a decision maker.

Plaintiffs view CEQA as requiring the decision maker who approves the project to be the person or entity that has completed the environmental review process. Plaintiffs assert that ARB violated this procedural rule of law because the Board approved the LCFS regulations while the responsibility of completing the environmental review process was delegated to the Executive Officer. To support their view of the law, plaintiffs argue that CEQA's prohibition against improperly delegating authority is based on the rationale that an environmental review document "cannot serve its informational function unless it is reviewed and considered by the governmental body which takes action having an effect upon the environment." (*Kleist v. City of Glendale* (1976) 56 Cal.App.3d 770, 779.)

ARB counters plaintiffs' position by contending it properly conducted the environmental review and properly delegated responsibility to the Executive Officer to finalize the LCFS regulations and respond to significant environmental issues. ARB supports this contention by asserting (1) the "decision-maker" in ARB rulemakings encompasses both the Board and the Executive Officer, (2) the Health and Safety Code explicitly authorizes ARB's hybrid decisionmaking structure, (3) the regulatory history of

ARB's certified regulatory program confirms the Executive Officer is properly considered a "decision maker" for ARB rulemaking, and (4) ARB's CEQA findings and delegation to the Executive Officer in Resolution 09-31 are consistent with CEQA and the Health and Safety Code.

ARB's arguments regarding improper delegation of authority, like its arguments regarding premature approval of the project, are based on its position that the critical point in the rulemaking process is the adoption of the final regulation. For example, ARB argues that the Executive Officer was the final "decision maker" and "properly executed each of his delegated responsibilities in analyzing and approving the responses to comments raising significant environmental issues, and properly adopted the final regulation." ARB also asserts: "Viewed in the correct light, it is simply inaccurate to argue that ARB *took final action* on the proposed regulation prior to considering and approving a written response to each issue raising significant environmental effects." (Italics added.)[32]

B.      Principles of Law

Plaintiffs' arguments regarding the improper delegation of authority reference (1) the principles regarding the delegation of authority in Guidelines section 15025, (2) the definition of "decision-making body" contained in Guidelines section 15356, and (3) case law that discusses the delegation of authority.

1.      *Regulatory Provisions*

Subdivision (a) of Guidelines section 15025 states that a "public agency may assign specific functions to its staff to assist in administering CEQA." A nonexclusive list of those delegable functions includes "[p]reparing a negative declaration or EIR,"

---

[32] ARB's arguments are flawed because they assiduously ignore the concept of "approval" and how it is defined for purposes of CEQA.

"[p]reparing responses to comments on environmental documents," and filing notices. (Guidelines, § 15025, subd. (a)(3), (5) & (6).)[33]

Conversely, subdivision (b) of Guidelines 15025 states that "[t]he decisionmaking body of a public agency *shall not delegate* the following functions: [¶] (1) Reviewing and considering a final EIR or approving a negative declaration prior to approving a project. [¶] (2) The making of findings required by Sections 15091 and 15093." (Italics added.) Although this subdivision does not refer to documents that may be used in place of an EIR, plaintiffs contend that the prohibition against delegation also applies to documents that are the functional equivalent of an EIR and, therefore, applies in this case.

The term "decision-making body" is defined by Guidelines section 15356 as "any person or group of people within a public agency permitted by law to approve or disapprove the project at issue."

### 2. Case Law Regarding Delegation of Authority

In *Kleist v. City of Glendale, supra,* 56 Cal.App.3d 770, a property owner filed a petition for writ of mandate alleging the city council violated CEQA when it rezoned certain property at the request of a developer. The trial court granted the petition and the appellate court affirmed. (*Kleist v. City of Glendale, supra,* at p. 779.) One of the issues addressed on appeal was whether the city council could delegate review, consideration and certification of an EIR to a special board created by city ordinance, prior to approval of the project by the city council. The appellate court concluded that the city council itself was required to review and consider the EIR, stating: "Delegation is inconsistent with the purpose of the review and consideration function since it insulates the members of the council from public awareness and possible reaction to the individual members' environmental and economic values. Delegation is inconsistent with the purposes of the

---

[33] We note that "preparing" these documents is not the same as reviewing, considering or certifying the documents.

44.

EIR itself.…  The EIR cannot serve its informational function unless it is reviewed and considered by the governmental body which takes action having an effect upon the environment." (*Ibid*.)

In *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296 (*Sundstrom*), an owner of property located near a proposed private sewage treatment plant filed a petition for a writ of mandate that challenged the county board of supervisor's issuance of a use permit for the construction of the plant.  The use permit included a condition that required the applicant to submit a hydrological study, which would be subject to review and approval by the county planning commission.  (*Id*. at p. 306.)  The use permit also required that any mitigation measures recommended by the hydrological study be incorporated into the project's plans.  (*Ibid*.)

The neighboring landowner in *Sundstrom* asserted various procedural and substantive violations of CEQA tainted the county's adoption of a negative declaration for the project.  (*Sundstrom*, *supra*, 202 Cal.App.3d at p. 304.)  The trial court denied the property owner's petition.  (*Id*. at p. 301.)  The appellate court reversed and directed the trial court to issue the requested writ of mandate.  (*Id*. at p. 314.)  Among other things, the appellate court concluded that the conditions contained in the use permit "improperly delegate[d] the County's legal responsibility to assess environmental impact by directing the applicant himself to conduct the hydrological studies subject to the approval of the planning commission staff." (*Id*. at p. 307.)  The county's board of supervisors could not delegate its responsibility to assess the project's environmental impacts to the staff of the planning commission.  (*Ibid*.)

Plaintiffs also cited *El Morro Community Assn. v. California Dept. of Parks & Recreation* (2004) 122 Cal.App.4th 1341 as an example where the action necessary for CEQA compliance was taken by a proper decision maker.  In that case, the California Department of Parks and Recreation (Department) proposed a project that involved the conversion of a mobile home park to a public campground and other facilities.  (*El*

45.

*Morro, supra,* at p. 1346.) A homeowners' group asserted that the Department had failed to proceed in the manner required by law because the EIR was not certified by the "decision maker" and, instead, was certified by a deputy director. (*Id.* at p. 1349.) The appellate court concluded the Department had proceeded as required by law because the deputy director was the person authorized by the Department to *certify* the EIR *and approve* the project and, therefore, the deputy director was the "'decision-making body'" under the definition contained in Guidelines section 15356. (*Id.* at pp. 1349-1350.)

Based on the foregoing cases and Guidelines sections 15025 and 15356, plaintiffs assert that the Executive Officer should not have been given the responsibility to finalize the environmental assessment because he did not have the authority to approve or disapprove the project--he was not *the* decisionmaker.

C.     Analysis

Earlier, we concluded that the Board gave its "approval" to the LCFS regulations *before* the Executive Officer completed the environmental review of the project and, as a result, violated CEQA. Our conclusion that the Board "approved" the project on April 23, 2009, necessarily requires us to reject ARB's position that the Executive Officer properly adopted the final regulation. The Executive Officer's adoption of the final regulation was improper because it violated the timing requirement of CEQA that "approval" occur after consideration of the environmental review documents. This flaw in the timing of the project's approval has tainted the procedures used by ARB and prevents us from analyzing, in isolation, the claim that the Executive Officer was not a proper decision maker.

The application of the concept of "approval" and our earlier conclusion that the "approval" came at an improper time leads us to the further conclusion that the Executive Officer, in the circumstances presented, cannot qualify as the "[d]ecision-making body"

under the definition contained in Guidelines section 15356.[34] The term "decision-making body" means "any person … within a public agency permitted by law to approve or disapprove the project at issue." (Guidelines, § 15356.) When the Board approved the project at the April 23, 2009, public hearing, it acted as the "decision-making body." Subsequent action by the Executive Officer could not have been taken in the capacity of "decision-making body" because that role had been filled already by the Board. In short, once the Board approved the project, it makes no sense to say the Executive Officer was the person permitted by law to "approve" the project for purposes of CEQA.

Based on our reading of the case law, the principle that prohibits the delegation of authority to a person or entity that is not a decision-making body includes a corollary proposition that CEQA is violated when the authority to approve or disapprove the project is separated from the responsibility to complete the environmental review. (*Sundstrom*, *supra*, 202 Cal.App.3d at p. 307; *Kleist v. City of Glendale*, *supra*, 56 Cal.App.3d at pp. 778-779.) This conclusion is based on a fundamental policy of CEQA. For an environmental review document to serve CEQA's basic purpose of informing governmental decision makers about environmental issues,[35] that document must be reviewed and considered by the same person or group of persons who make the decision to approve or disapprove the project at issue. In other words, the separation of the approval function from the review and consideration of the environmental assessment is inconsistent with the purpose served by an environmental assessment as it insulates the person or group approving the project "from public awareness and the possible reaction to the individual members' environmental and economic values." (*Kleist v. City of*

---

**34** This conclusion is limited to the facts presented. It does not imply that ARB's Executive Officer can never be the decision-making body—that is, the person authorized by law to approve or disapprove the project.

**35** Guidelines section 15002, subdivision (a)(1).

*Glendale*, *supra*, at p. 779.)  This purpose of CEQA and the underlying policy applies with equal force whether the environmental review document is an EIR or documentation prepared under a certified regulatory program.  (See §§ 21002, 21080.5; Guidelines, § 15250.)

Under the facts of this case, it is clear that ARB violated a fundamental policy of CEQA when it gave the responsibility for completing the environmental review process to the Executive Officer because he did not have the authority to approve or disapprove the project.  In particular, the Executive Officer had no authority to alter the way the Board resolved the controversy regarding the carbon intensity values added to certain fuel pathways to account for indirect effects caused by land use changes.

IV.    DEFERRED FORMULATION OF MITIGATION MEASURES FOR NITROGEN OXIDE

Plaintiffs' third CEQA claim asserts that ARB impermissibly deferred its analysis and mitigation of potential increases in NOx emissions resulting from the increased use of biodiesel fuel that will be caused by the LCFS regulations.

A.    Facts

One of ARB's methods for reducing the carbon content of transportation fuels used in California is to promote the use of biodiesel, either as a substitute for, or blended with, petroleum-based diesel fuel.  In 2008, approximately 4.2 billion gallons of diesel fuel were consumed in California, while the state's total commercial biodiesel production capacity was approximately 35 million gallons per year.

Biodiesel and renewable diesel were among the fuels and conversion technologies discussed in the ISOR as being currently available for commercial use.[36]  Biodiesel can

---

[36] Chapter III, section B of the ISOR also discussed (1) ethanol from grains and sugars, (2) biogas from landfills and digesters, (3) compressed and liquefied natural gas, (4) electricity, and (5) hydrogen.

be made from almost any plant oil or animal fat. The "bio" prefix is used to distinguish biodiesel from traditional petroleum-based diesel fuel.

The process for making biodiesel uses a catalyst and alcohol to convert oils and fats into biodiesel.[37] In the United States, the plant feedstock (i.e., the vegetable oil) used for making biodiesel includes soybean, peanut, canola, cottonseed and corn oil. About 90 percent of U.S. biodiesel is made from soybeans. The animal fats used to make biodiesel include used restaurant grease (yellow grease) and tallow.

The ISOR includes a chapter that addresses the environmental benefits and impacts associated with the LCFS regulation. The section on air quality impacts discusses motor vehicle emissions and includes three paragraphs about biodiesel and renewable diesel.[38] The first of these paragraphs is important to this appeal because it is at the center of the controversy regarding the deferral of analysis and mitigation. That paragraph states:

> "The main factors that will affect changes in emission rates from biodiesel as compared to diesel are feedstock composition, changes in engine technologies, and regulatory action. Biodiesel feedstocks can have a significant effect on emissions of ROG, PM, and NOx. NOx is of particular interest because biodiesel has been reported to increase NOx emissions. ARB staff has assumed that there will be no increase in the emissions of NOx. This is because staff is currently conducting an extensive test program for biodiesel and renewable diesel and will follow that effort with a rulemaking to establish specifications to ensure there is no increase in NOx."

---

[37] Renewable diesel is made using a different chemical process that produces different compounds. In particular, renewable diesel is free of the ester compounds in biodiesel, which results in reduced particulate matter (PM), NOx, hydrocarbon, and CO emissions.

[38] Chapter VIII of the ISOR is titled "Environmental Impacts" and contains 36 pages. Of those pages, 18 are devoted to the section on air quality impacts. The three paragraphs addressing biodiesel and renewable diesel appear under the heading "Biodiesel and Renewable Diesel vs. Diesel Vehicles." (Underlining omitted.)

More details about the emission from vehicles using biodiesel and renewable diesel are set forth in Appendix F7 of the ISOR, which is titled "Motor Vehicle Emissions—Biodiesel vs. Diesel." Appendix F7 states that under the LCFS regulations, "15% of petroleum diesel will be displaced by renewable alternative diesel fuels (biodiesel 5% and renewable diesel 10%)."[39] The appendix notes that this substitution away from petroleum-based diesel has the potential to change emission rates and estimates those changes. In particular, Table F7-1 uses three different scenarios and sets forth the emissions changes for ROG, NOx and PM expected by 2020. The three scenarios account for uncertainty in available data and "are presented to cover the range of possible emission changes that can be expected from the 2020 fleet." The first scenario shows no change for the three types of emissions. The second and third scenarios show decreases in ROG and PM, but an increase in NOx.

The statements in the ISOR about additional rulemaking to establish specifications for biodiesel were confirmed in Resolution 09-31, which directed the Executive Officer to work with various stakeholders "to complete the ongoing multimedia evaluation for biodiesel and renewable diesel; and propose, as appropriate, motor-vehicle fuel specifications for biodiesel and renewable diesel by December 2009."

Despite the unresolved issue regarding NOx emissions from biodiesel, the proposed LCFS regulations included two pathways for biodiesel in the carbon intensity lookup table for diesel and fuels that substitute for diesel. The pathways addressed two methods of converting used cooking oil to biodiesel.

In addition, the FSOR released in December 2009 stated that it was ARB's "intent that, by the end of the rulemaking, Table 7 in section 95486(b) will include specified

---

[39] The fact that the use of renewable diesel is expected to be double that of biodiesel and the fact that renewable lowers NOx emissions creates a question about whether the potential reductions will partially or completely offset the anticipated increases caused by biodiesel.

carbon intensity values and supporting documentation for two additional fuel pathways"—namely, biodiesel converted from Midwest soybeans and renewable diesel converted from Midwest soybeans. The two additional pathways were to be discussed in a separate FSOR.

The FSOR also included a response to a comment that challenged ARB's assumption that increased biodiesel usage would not increase NOx emissions. That response provided in full:

> "We acknowledge the reviewer's comment that NOx is generally higher with biodiesel and biodiesel blends than diesel. Also, the NOx difference typically increases as the blend level increases, with pure biodiesel (B100) generally having highest NOx difference. Although NOx is caused by thermal formation, a number of studies show that fuel specifications can affect NOx emissions. The reviewer notes that fuel specifications alone cannot make biodiesel NOx neutral, and this may be the case for higher blends or B100. However, staff believes that lower blends of biodiesel can be mitigated by adjustments to fuel specifications. Therefore, staff believes that controlling fuel specifications can, to some extent, mitigate increases in NOx associated with biodiesel fuels, at least at lower blend levels. Also, the use of additives and lower NOx biodiesel may extend the blend level so that NOx can be mitigated.

> "Other potential strategies may include blending biodiesel feedstocks with other low NOx feedstocks, such as renewable diesel or gas-to-liquids diesel substitutes, to counteract the NOx increase due to biodiesel. The preliminary results from ARB's ongoing biodiesel emissions study suggest that NOx emissions may be mitigated for biodiesel blends (up to B20) that are made from soy, which is a feedstock that has been shown to be on the high end for NOx emissions."

The FSOR also included a comment from the American Trucking Association stating it was uncertain how ARB would ensure that that biodiesel use did not increase NOx emission and expressing the concern that fuel additives to reduce such emissions might increase fuel costs and adversely impact engine durability or the long term efficacy of emission control equipment. ARB responded that it would "ensure that biodiesel fuel use does not increase NOx emissions significantly by promulgating a new motor vehicle

fuel specification for biodiesel," the adoption of which was "now tentatively scheduled for 2010."

This schedule, like the December 2009 date set in Resolution 09-31, was not achieved. The final report generated by ARB's biodiesel emissions study was not issued until October 2011. The report noted that a number of factors affected NOx emissions, such as the feedstock used to produce the biodiesel, percentage of biodiesel in the fuel blend, engine type, and engine operating conditions including load. The report stated that "further research is needed to understand the impacts biodiesel would have in California with widespread use."

As of June 2013, it does not appear that ARB has adopted any regulations containing fuel specifications for biodiesel.

B.     Legal Principles

*1.     General Rules Regarding Mitigation Measures*

A state agency considering proposed action under a certified regulatory program must not approve or adopt the activity "if there are feasible alternatives or feasible mitigation measures available that would substantially lessen a significant adverse effect that the activity may have on the environment." (§ 21080.5, subd. (d)(2)(A).) As to the written documentation prepared under a certified regulatory program, it must include a description of "mitigation measures to minimize any significant adverse effect on the environment of the activity." (§ 21080.5, subd. (d)(3)(A).) This obligation to describe mitigation measures is one of the procedural requirements of CEQA "intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects." (§ 21002.)

The foregoing statutory provisions (and the parallel requirements for EIR's) are the basis for the general rule that it is inappropriate to postpone the formulation of

52.

mitigation measures. (1 Kostka & Zischke, *supra*, § 14.12, pp. 696-697.) This general rule against deferral also is set forth in the regulation that governs the contents of EIR's: "Formulation of mitigation measures should not be deferred until some future time." (Guidelines, § 15126.4, subd. (a)(1)(B).)

2. *Exception Allowing Deferred Formulation of Mitigation Measures*

However, this general rule against deferring the formulation of mitigation measure is not absolute. Courts have recognized that "there are circumstances in which some aspects of mitigation may appropriately be deferred." (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 670; 1 Kostka & Zischke, *supra*, § 14.12, p. 696-697.) The regulation governing the contents of EIR's also acknowledges the existence of the exception: "However, measures may specify performance standards which would mitigate the significant effect of the project and which may be accomplished in more than one specified way." (Guidelines, § 15126.4, subd. (a)(1)(B).)

There is not a single, all-encompassing statement of the judge-made exception to the general rule prohibiting the deferral of the formulation of mitigation measures. Although the parties have agreed that such an exception exists, they have not described that exception in the same language. Consequently, we will review the way the exception has been expressed in various cases.[40]

In *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011 (*SOCA*), the city council decided to expand the downtown convention center and

---

[40] Two early cases addressing the improper deferral of mitigation measures are *Sundstrom*, *supra*, 202 Cal.App.3d 296, and *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359. Both cases involved negative declarations. Our discussion here is limited to cases involving EIR's or their functional equivalents.

construct an office tower.[41]  (*Id*. at p. 1015.)  An association challenged the project's EIR on the ground that it failed to describe and examine "true" mitigation measures for the project's parking impacts.  (*Id*. at p. 1026.)  The association argued that the EIR lacked specific mitigation measures and instead offered a list of seven general measures that might be included in the city's unformulated transportation management plan.  The majority of the court quoted a CEQA commentator for the following principle:

> "'[F]or kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process (e.g., at the general plan amendment or rezone stage), the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated. [Citations.]'"  (*SOCA, supra,* at pp. 1028-1029.)

Under this statement of the exception, it appears that the formulation of mitigation measures is properly deferred when three elements are satisfied.  First, practical considerations prevented the formulation of mitigations measures at the usual time in the planning process.  Second, the agency *committed* itself to formulating the mitigation measures in the future.  Third, the agency *adopted specific performance criteria* that the mitigation measures were required to satisfy.

In *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777 (*Endangered Habitats*), the Fourth Appellate District addressed the deferred formulation of mitigation measures using the following language:

> "'Deferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan. [Citation.]  On the other hand, an agency goes too far when it simply

---

**41**  *SOCA* has been described as the leading case on the issue of deferred formulation of mitigation measures.  (1 Kostka & Zischke, *supra*, § 14.12, p. 698.)

requires a project to obtain a … report and then comply with any recommendations that may be made in the report. [Citation.]' If mitigation is feasible but impractical at the time of a general plan or zoning amendment, it is sufficient to articulate specific performance criteria and make further approvals contingent on finding a way to meet them. [Citation.]" (*Endangered Habitats*, *supra*, 131 Cal.App.4th at p. 793.)[42]

This version of the exception to the general rule prohibiting the deferral of the formulation of mitigation measures adds an element not mentioned in the material quoted by the majority in *SOCA*—namely, the requirement for a *list* of the mitigation measures to be considered, analyzed and possibly incorporated in the mitigation plan.

In *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603 (*CNPS*), the Third Appellate District's discussion of the case law concerning the deferred formulation of mitigation measures included the following statement:

"… *SOCA* stands for the proposition that when a public agency has evaluated the potentially significant impacts of a project and has indentified measures that will mitigate those impacts, the agency does not have to commit to any particular mitigation measure in the EIR, as long as it commits to mitigating the significant impacts of the project. Moreover, under *SOCA*, the details of exactly how mitigation will be achieved under the identified measures can be deferred pending completion of a future study." (*Id*. at p. 621.)

Later, in less expansive language, the court set forth the principle that "[i]f the agency has *identified* one or more mitigation measures and has *committed* to mitigating the impact those measures address, then the principles forbidding deferral of mitigation

---

**42** This language from *Endangered Habitats* also was quoted by this court in *San Joaquin Raptor Rescue Center v. County of Merced*, *supra*, 149 Cal.App.4th 645, 670, the first case published in this century in which we considered whether to apply the exception permitting the deferral of mitigation. We also considered the exception and concluded it did not apply in *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1121-1122 (*Gray*), and *Madera Oversight Coalition, Inc. v. County of Madera, supra,* 199 Cal.App.4th at p. 58, although the discussion in the latter case was not published.

55.

are not implicated." (*CNPS*, *supra*, 172 Cal.App.4th at p. 623, italics added.) We note that these quotes from *CNPS* do not mention specific performance criteria like the earlier-quoted language from *SOCA* and *Endangered Habitats*.

In *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70 (*CBE*), the First Appellate District set forth another description of the exception permitting deferral. After discussing *SOCA* and *CNPS*, the court stated that those cases "permitted the lead agency to defer the formulation of mitigation measures after the lead agency (1) undertook a complete analysis of the significance of the environmental impact, (2) proposed potential mitigation measures early in the planning process, and (3) articulated specific performance criteria that would ensure that adequate mitigation measures were eventually implemented." (*CBE, supra,* at p. 95.)

The foregoing cases demonstrate that the exception allowing the deferral of the formulation of mitigation measures has been expressed in a variety of ways. From these cases, we glean two principles that are important to this case. First, the deferral of the formulation of mitigation measures requires the agency to commit itself to *specific performance criteria* for evaluating the efficacy of the measures implemented. Second, the "activity" constituting the CEQA project may not be undertaken without mitigation measures being in place "to minimize any significant adverse effect on the environment of the activity." (§ 21080.5, subd. (d)(3)(A).) In other words, the deferral relates only to the *formulation* of mitigation measures, not the mitigation itself. Once the project reaches the point where activity will have a significant adverse effect on the environment, the mitigation measures must be in place.

### 3. Specific Performance Standards

ARB's version of the exception is based primarily on the following quote: "'Deferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly

incorporated in the mitigation plan.' … [Citation.]" (*Endangered Habitats*, *supra*, 131 Cal.App.4th at p. 793; see *CNPS*, *supra*, 172 Cal.App.4th at p. 621.)

ARB's version of the exception does not reference "specific performance criteria" or the future action being "contingent" upon the satisfaction of such criteria. (See *SOCA*, *supra*, 229 Cal.App.3d at 1029; 1 Kostka & Zischke, *supra*, § 14.12, pp. 697-698 [deferral may be particularly appropriate when performance criteria are identified and further approvals are made contingent on finding a way to meet those criteria].)

We disagree with ARB's view of the law concerning the deferred formulation of mitigation measures because, among other things, we already have adopted the position "that CEQA permits a lead agency to defer specifically detailing mitigation measures as long as the lead agency commits itself to mitigation and to *specific performance standards* …." (*Gray*, *supra*, 167 Cal.App.4th at p. 1119, italics added; see *San Joaquin Raptor Rescue Center v. County of Merced*, *supra*, 149 Cal.App.4th at p. 671 [mitigation measure required preparation of land management plan for burrowing owl preserve; EIR improperly deferred formulation of this mitigation measure because it set forth no criteria or standards of performance]; *Endangered Habitats*, *supra*, 131 Cal.App.4th at p. 794 [proposal for noise mitigation rejected because it allowed the approval of grading and building permits "without setting any standards"].)

ARB has presented no rationale for deviating from this precedent and, therefore, we will follow our earlier decisions and require an agency to commit to specific performance standards.[43]

---

**43** Our conclusion is consistent with the language from the *SOCA* decision that states "the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval" (*SOCA*, *supra*, 229 Cal.App.3d at p 1029) as well as the many cases that have referred to specific performance criteria or standards. (E.g. *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 945 [loose or open-ended performance criteria prohibited]; *Endangered Habitats*, *supra*, 131 Cal.App.4th at pp. 793-794.)

Because of ARB's view of the law, it has not explicitly addressed the issue whether it committed to specific performance criteria when it deferred formulating mitigation measures for the potential increase in NOx emissions from biodiesel. Nonetheless, the ISOR addressed NOx emissions from biodiesel by stating that ARB's staff would conduct an extensive testing program for biodiesel and "will follow that effort with a rulemaking to establish specifications to ensure there is no increase in NOx." Thus, we will consider whether the statement that ARB's future rules will "establish specifications to ensure that there is no increase in NOx" has articulated specific performance criteria as required by *SOCA* and subsequent cases, such as this court's decision in *Gray*. We conclude that "no increase in NOx" is not a specific performance criterion.

In *CBE*, *supra*, 184 Cal.App.4th 70, another case involving greenhouse gas emissions, Chevron proposed to replace and upgrade certain manufacturing facilities at its oil refinery in Richmond. The city council approved the necessary permits and certified the EIR. (*Id*. at p. 75.) Late in the environmental review process—that is, in an addendum circulated four months after issuance of the final EIR—the city belatedly found that the project's greenhouse gas emissions would be a significant impact. (*Id*. at pp. 90-91.) The amended EIR addressed this impact by putting forth "some proposed mitigation measures to ensure that the Project's operation 'shall result in no net increase in GHG emissions over the Proposed Project baseline.'" (*Id*. at p. 91.) The amended EIR plan gave Chevron one year to submit to the city, for approval by the city council, "'a plan for achieving complete reduction of GHG emissions up to the maximum estimated … Project GHG emissions increase over the baseline (890,000 metric tons per year …).'" (*Ibid*.) The First Appellate District concluded the mitigation plan for greenhouse gases violated CEQA because the city "delayed making a significance finding until late in the CEQA process, divulged little or no information about how it quantified the Project's greenhouse gas emissions, offered no assurance that the plan for how the Project's

greenhouse gas emissions would be mitigated to a net-zero standard was both feasible and efficacious, and created *no objective criteria for measuring success*." (*CBE, supra,* at p. 95, italics added; see *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, [EIR's plan for active habitat management of open space preserve did not specify any performance standards]; *Gray*, *supra*, 167 Cal.App.4th at p. 1119 [CEQA violated because county committed itself to a specific mitigation goal, not a specific performance standard].)

We conclude that ARB's statement that its future rulemaking will "establish specifications to ensure there is no increase in NOx" suffers from the same defect as the net-zero standard for greenhouse gas emissions adopted in *CBE*—it established no objective performance criteria for measuring whether the stated goal will be achieved. As a result, we and members of the public have not been informed how ARB will determine that the requirements it adopts in a fuel specifications regulation will ensure that use of the biodiesel does not increase NOx emissions. To illustrate this point, it is unclear what tests will be performed and what measurements will be taken to determine that biodiesel use is not increasing NOx emissions.

In summary, ARB's statement that its rulemaking would "ensure that there is no increase in NOx" is similar to the "generalized goal of no net increase in greenhouse gas emissions" that was deemed deficient in *CBE*, *supra*, 184 Cal.App.4th at page 93. Thus, ARB violated CEQA by improperly deferring the formulation of mitigation measures for the increase in NOx emissions that might result from the increase use of biodiesel fuel caused by the LCFS regulations.

### 4. *Delayed Mitigation*

Here, ARB has gone forward with the project's activity—that is, ARB has implemented the LCFS regulations—without putting in place any mitigation measures for the potential increase in NOx emissions resulting from the use of biodiesel. This absence of mitigation measures for project activity constitutes a violation of CEQA. Only the

formulation of mitigation measures may be deferred, mitigation itself cannot be deferred past the start of the project activity that causes the adverse environmental impact.

C.     Corrective Action on Remand

On remand, ARB may not simply assume that the LCFS regulations will not have a significant adverse impact on the environment.  ARB must make a finding of fact, supported by substantial evidence, on the question whether the project will have a significant adverse effect on the environment as a result of the potential increase in NOx emissions.

If ARB finds that the LCFS regulations will adversely impact the environment by increasing NOx emissions, then ARB must adopt mitigation measures that minimize the adverse impact.  (See § 21080.5, subd. (d)(3)(A).)  Because the LCFS regulations have been in effect, it is no longer appropriate to defer the implementation of mitigation measures.

Alternatively, if ARB finds that the LCFS regulations will not adversely impact the environment by increasing NOx emissions, then no mitigation measures are required by CEQA.  We recognize that the parties disagree on how the potential adverse impacts of NOx emissions should be analyzed, but are not able resolve those disagreements because they involve questions of fact that must be addressed in the first instance by ARB.  For example, we cannot define the appropriate geographical area or areas for analyzing the NOx emissions.  Also, we cannot determine whether the NOx emissions analysis should be done from the perspective that analyzes the project as a whole, each substitute fuel separate, or some other basis.

## V.  ADMINISTRATIVE PROCEDURES ACT CHALLENGE[*]

Under the APA, a public agency is required to maintain a rulemaking file and make that file available to the public during the comment period for the proposed regulation.  (Gov. Code, § 11347.3.)[44]  Plaintiffs claim ARB violated the APA by omitting from the rulemaking file four emails from consultants hired by ARB.  The consultants were Dr. Thomas W. Hertel of Purdue University and Richard Plevin of the University of California at Berkeley.  Hertel's emails have particular significance because he created the GTAP model[45] and, in April 2009, was the head of the organization that maintained it.

Generally, the GTAP model is used to estimate the impacts resulting from changes in policy.  Here, the GTAP model was adapted to estimate the land use changes likely to result from the proposed LCFS regulations and to estimate how those changes would impact greenhouse gas emissions.  Ultimately, ARB relied on the model's estimates of indirect land use effects to add 30 gCO2E/MJ to the carbon intensity value of ethanol produced from corn.  The application of the GTAP model and the calculation of indirect impacts from land use changes is a controversial subject.

The four emails are relevant to the interests of POET and other ethanol producers because they relate to the carbon intensity value assigned to ethanol to account for the indirect effects of land use changes resulting from the increased demand for ethanol

[*]  See footnote, *ante,* page 1.

[44]  All further statutory references in part V of this opinion, unless otherwise indicated, are to sections of the APA set forth in the Government Code.

[45]  The LCFS regulations define "GTAP" and "GTAP Model" as the Global Trade Analysis Project Model (January 2010), which is a software package comprised of (1) a visual interface for use the with the GTAP databases maintained by Purdue University, (2) a February 2009 GTAP model customized for corn ethanol, (3) a February 2009 GTAP model customized for sugarcane ethanol, and (4) a compressed file containing the January 2010 model customized for Midwest soybeans.  (Cal. Code Regs., tit. 17, § 95481, subd. (a)(30)(A)-(D).)

caused by the LCFS regulation.  The logic of the connection between the emails and the carbon intensity value assigned to ethanol is based on the following steps:  (1) The LCFS regulations will increase the demand for crops used to produce ethanol.  (2)  The increased demand, and related price increases, will cause farmers to convert land from existing uses to produce either crops used to produce ethanol or food to replace the crops use to produce ethanol.  (3) The changes in land use will release carbon into the atmosphere and/or lower the rate at which carbon is removed from the atmosphere.  For example, a growing forest removes more carbon than a corn field.  (4) These changes in carbon emissions and storage are indirect effects of using ethanol to satisfy the requirements of the LCFS regulations and, therefore, should be reflected in the carbon intensity values assigned to ethanol.  (5) ARB used the GTAP to estimate the land use changes and the carbon intensity value that should be assigned to ethanol to account for the impact of the land use changes.  (6) The emails concern the operation of the GTAP model and the data fed into that model and, therefore, are relevant to the carbon intensity value assigned to ethanol.

The basic criticisms of increasing ethanol's carbon intensity value based on land use changes are that (1) other fuels are not required to account for their indirect greenhouse gas impacts, which gives those other fuels an inappropriate advantage over ethanol, and (2) the indirect effects are too difficult to quantify at the present because of incomplete data and assumptions made in modeling the effects.

The other side of the argument asserts that, although uncertainty exists, a start must be made somewhere.  For example, a comment letter dated April 21, 2009, from the "Union of Concerned Scientists" took the position that the LCFS regulations should use carbon intensity values that include indirect emissions from land use changes.  That letter asserted:

> "There are uncertainties inherent in estimating the magnitude of indirect land use emissions from biofuels, but assigning a value of zero is clearly

62.

not supported by the science. The data on land use change indicate that the emissions related to biofuels are significant and can be quite large. Grappling with the technical uncertainty and developing a regulation based on the best available science is preferable to ignoring a major source of emissions. Over time, greater accuracy and detail in a more refined analysis can be reflected in future LCFS rulemakings."

The emails from Hertel and Plevin tie into these arguments because they address topics such as databases, assumptions used and results produced by the GTAP model.

A.     Summary of Legal Issues and Conclusions

Plaintiffs contend that ARB violated the rulemaking procedures of the APA specifying the contents of the rulemaking file by omitting the consultant emails from that file, thereby thwarting the public's right to information. Plaintiffs further contend that ARB's decision to keep these documents confidential until after the regulation was finalized constitutes a substantial failure to comply with the APA and, thus, justifies invalidating the regulation. ARB disagrees with these contentions.

We hold that ARB violated its disclosure obligations under the rulemaking procedures of the APA. Our holding is based on the following conclusions:

(1) The statutory interpretation of the APA advocated by ARB in this litigation is entitled to no deference from the courts.

(2) The interpretation of the provisions of the APA presents this court with a question of law subject to independent review.

(3) The emails contain "other factual information" and were "submitted to the agency" as those terms are used in section 11347.3, subdivision (b)(6). Therefore, ARB violated the statute by omitting the emails from the rulemaking file.

As for the appropriate remedy, we conclude that, even if the omissions constitute "a substantial failure to comply with" the APA as that phrase is used in subdivision (a) of section 11350, the circumstances of this case do not favor invalidating the LCFS regulation. Instead, pursuant to our equitable authority, we will direct ARB to include

63.

the emails in the rulemaking file, which will allow the public to comment on the emails prior to ARB's reconsideration of the LCFS regulations.

B.      Statutory Provisions

1.      *Procedures for Rulemaking*

Chapter 3.5, article 5 of the APA governs the adoption and amendment of regulations by state agencies, a process commonly known as rulemaking. (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1175.) That chapter establishes "basic minimum procedural requirements" for rulemaking. (§ 11346, subd. (a).)

Pursuant to those procedural requirements, agencies must, among other things, (1) give the public notice of the proposed regulatory action; (2) issue a complete text of the proposed regulation with a statement of reasons for it; (3) give interested parties an opportunity to comment on the proposed regulation; (4) respond in writing to public comments; and (5) maintain a file as the record for the rulemaking proceeding. (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 568 (*Tidewater*);[46] § 11347.3, subd. (a).)

One purpose of the APA's formal rulemaking procedures is to give those persons and entities affected by a regulation a voice in its creation. (*Tidewater*, *supra*, 14 Cal.4th at p. 568.) The benefits of public participation in the regulatory process include (1) the

---

[46] Our summary of the APA's requirements is tailored to this case and, thus, the last requirement concerning the file is broader than the description given by the *Tidewater* court. In *Tidewater*, the last requirement listed by our Supreme Court stated that the agency must "forward a file of all materials on which the agency relied in the regulatory process to the Office of Administrative Law [citation], which reviews the regulation for consistency with the law, clarity, and necessity [citation]." (*Tidewater*, *supra*, 14 Cal.4th at p. 568.) Unlike ARB's appellate brief, we do not interpret the Supreme Court's more narrow description of an agency's duty concerning the file as curtailing the agency's obligation to comply with the other statutory requirements concerning that file, such as contained in section 11347.3, subdivision (b).

agency being informed by interested parties about possible unintended consequences of a proposed regulation and (2) directing the attention of agency policymakers to the public they serve, thus providing some protection against bureaucratic tyranny. (*Id*. at p. 569.) Another purpose of the APA's procedural requirements is to create an administrative record assuring effective judicial review. (*Voss v. Superior Court* (1996) 46 Cal.App.4th 900, 908.)

Compliance with the rulemaking procedures set forth in chapter 3.5 of the APA is significant because the "regulation ... may be declared to be invalid for a substantial failure to comply with [chapter 3.5] …." (§ 11350, subd. (a).)

2.      *Maintenance and Use of the Rulemaking File*

The APA requires state agencies to maintain a record of the rulemaking proceeding. (§ 11347.3, subd. (a).) That record is referred to as the "rulemaking file." Rulemaking file requirements are outlined in section 11347.3, subdivision (b). The rulemaking file is used by the state agency and must be made available to others— namely, the public, the Office of Administrative Law,[47] and the courts. (§ 11347.3, subds. (c), (d).)

The public-availability requirement is in effect *throughout the rulemaking proceedings*. (§ 11347.3, subds. (a), (d).) In 2000, the APA was amended to include the following provision: "Commencing no later than the date that the notice of the proposed

---

[47] Agencies are required to forward the rulemaking file to the Office of Administrative Law, which may refer to the file when it reviews the regulation for consistency with the law, clarity and necessity. (§ 11347.3, subd. (c); § 11349.1, subd. (a).) After conducting this review, the Office of Administrative Law either approves or disapproves the regulation. (§ 11349.3; *Syngenta Crop Protection, Inc. v. Helliker, supra,* 138 Cal.App.4th at pp. 1175-1176.) If the office approves the regulation, it transmits the regulation to the Secretary of State for filing. (§ 11349.3, subd. (a).) Until filed with the Secretary of State, a regulation may not be utilized or enforced. (§ 11340.5, subd. (a).)

action is published in the California Regulatory Notice Register, and during all subsequent periods of time that the file is in the agency's possession, the agency shall make the file available to the public for inspection and copying during regular business hours." (§ 11347.3, subd. (a); see Stats. 2000, ch. 1060, § 30.) "A major purpose of the rulemaking statute is to promote meaningful public participation in agency rulemaking— for this purpose it is helpful to have the rulemaking file available throughout the rulemaking process." (Administrative Rulemaking (Oct. 1999) 29 Cal. Law Revision Com. Rep. (1999) p. 469.)

The APA also addresses the role of the rulemaking file in court proceedings challenging the validity of the regulation. (See § 11350, subd. (a) [validity of regulation may be challenged in declaratory relief action ].) First, the APA requires the agency to make the file available to any court reviewing the regulation. (§ 11347.3, subd. (d).) Second, subdivision (d) of section 11350 provides that in a proceeding concerning the validity of a regulation, "a court may only consider the following evidence: [¶] (1) The rulemaking file prepared under Section 11347.3. [¶]…[¶] (3) An item that is required to be included in the rulemaking file but is not included in the rulemaking file, for the sole purpose of proving its omission."[48] The Law Revision Commission comment explaining subdivision (d)(3) of section 11350 states:

> "Such evidence may be necessary to prove a substantial failure to follow required procedures. For example, an agency's failure to include a public comment in a rulemaking file may constitute a substantial failure to follow required procedures. See Section 11347.3(b)(6) (written public comments must be included in rulemaking file). Proof of such an omission requires consideration of the omitted item." (Cal. Law Revision Com. com., 32D West's Ann. Gov. Code (2005 ed.) foll. § 11350, p. 215; Administrative Rulemaking (Oct. 1999) 29 Cal. Law Revision Com. Rep., *supra*, p. 552.)

---

[48] Subparts (2) and (4) of this subdivision are not relevant to this case.

Section 11350, subdivision (d)(3) establishes that the four emails were relevant, admissible evidence for purposes of proving plaintiffs' claim that ARB violated the APA's provisions governing the contents of the rulemaking file.[49]  The Law Revision Commission comment also indicates that some failures to include required materials in the rulemaking file constitute substantial failures to comply with the APA's procedural requirements and, thus, justify declaring the regulation invalid.  (See pt. V.F, *post*.)

### 3. *Mandatory Contents of the Rulemaking File*

Section 11347.3, subdivision (b) uses mandatory language in specifying the contents of the rulemaking file.  Specifically, the file "shall include":

> "(6) All data and other factual information, any studies or reports, and written comments submitted to the agency in connection with the adoption … of the regulation.

> "(7) All data and other factual information, technical, theoretical, and empirical studies or reports … on which the agency is relying in the adoption … of a regulation ….  [¶]…[¶]

> "(11) Any other information, statement, report, or data that the agency is required by law to consider or prepare in connection with the adoption … of a regulation."  (§ 11347.3, subd. (b).)

Under these provisions, the rulemaking file must include certain materials that were (1) *submitted to* the agency, (2) *relied upon* by the agency, or (3) *required by law to be considered* by the agency.

---

**49**  Therefore, subdivision (d)(3) of section 11350 is the basis for our conclusion that the trial court committed legal error when it granted ARB's motion to strike the four emails and other omitted documents.  On remand, the trial court will be directed to vacate its order granting the motion to strike.

C.  Standard of Review for Rulemaking Provision Challenges

Before deciding the proper interpretation of the mandatory provisions of section 11347.3, subdivision (b) and how to apply that interpretation to the facts of this case, we must resolve a threshold dispute regarding the appropriate standard of review.

### 1.  Contentions of the Parties

Plaintiffs contend that a procedural error, such as the failure to proceed in the manner required by the APA, is subject to independent review by this court.

In contrast, ARB contends that the standard of review applicable to "a purely procedural APA claim is not precisely clear." ARB argues that the most appropriate standard of review in a situation involving the construction and application of rulemaking file section 11347.3 is the "independent judgment/great weight standard" discussed by Justice Mosk in his concurring opinion in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 17 (*Yamaha*). This label was used to summarize the principle that construction of a statute by officials charged with its administration is entitled to great weight, but the final responsibility for the interpretation of the law rests with the courts. (*Ibid*.) ARB asserts the independent judgment/great weight standard applies because:

> "Here, both ARB and the Office of Administrative Law, the agency tasked with ensuring the consistency with the APA, concluded that ARB was in compliance with the statute.… This is entitled to great weight unless clearly erroneous or unauthorized. [Citations]."

In addition, ARB argues that a regulation certified by the Office of Administrative Law is subject to a rebuttable presumption that the regulation was "duly adopted" and in compliance with all the requirements of chapter 3.5 of the APA. (§ 11343.6, subds. (a) & (c).) Thus, in ARB's view, plaintiffs must overcome the deference given to interpretations of the agency and the Office of Administrative Law, as well as the presumption of compliance.

## 2. General Principles

In *Yamaha*, the majority opinion discussed the standard of review applicable to an agency interpretation of a statute.

> "Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation. Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth. [Citation.] Considered alone and apart from the context and circumstances that produce them, agency interpretations are not binding or necessarily even authoritative. To quote the statement of the Law Revision Commission in a recent report, 'The standard for judicial review of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' [Citation.]" (*Yamaha*, *supra*, 19 Cal.4th at pp. 7-8.)

Pursuant to this general overview of the law, we will determine the deference to be given to ARB's interpretation of the provisions concerning the rulemaking file by considering the context and circumstances presented in this case.

## 3. Analysis and Conclusion

We conclude ARB's interpretation of the statutory provisions concerning the rulemaking file is not entitled to deference because (1) ARB's interpretation was not set forth in a formal regulation; (2) ARB is subject to the statute in question, not charged with its administration (*Morris v. Williams* (1967) 67 Cal.2d 733, 748); (3) ARB has no expertise or technical knowledge that gives it special insight into the meaning of the APA's provisions that specify the mandatory contents of a rulemaking file (see *California Society of Anesthesiologists v. Brown* (2012) 204 Cal.App.4th 390, 405; *Church v. Jamison* (2006) 143 Cal.App.4th 1568, 1579); (4) the interpretation advanced by ARB in this litigation was not explicitly adopted or approved by the agency's senior officials, such as the Board or the Executive Officer (see *Allende v. Department of California Highway Patrol* (2011) 201 Cal.App.4th 1006, 1018 [agency decision

69.

carefully considered by senior agency officials is entitled to greater weight]; *Yamaha*, *supra*, 19 Cal.4th at p. 12 [interpretation contained in an advice letter prepared by a single staff member receives less deference]); and (5) the record contains no evidence indicating that the interpretation advanced by counsel in this litigation has a long-standing history at ARB or any other agency (*State of California ex rel. Nee v. Unumprovident Corp.* (2006) 140 Cal.App.4th 442, 451 [where agency has neither a formal regulation nor a long-standing interpretation of a statute, "courts may simply disregard the opinion offered by the agency"]).

In addition to the foregoing factors, if California court's deferred to each public agency's interpretation of the APA's provisions governing the contents of the rulemaking file, several different interpretations could result and the public disclosure provided to California's citizens would vary from agency to agency. To avoid this lack of uniformity, the judiciary should make the ultimate decision regarding the meaning and effect of section 11347.3 without deference to the position adopted by the agency.

Therefore, we conclude that the independent standard of appellate review applies to the interpretation of subdivision (b) of section 11347.3. This statutory interpretation poses a question of law. (See *PM & R Associates v. Workers' Comp. Appeals Bd.* (2000) 80 Cal.App.4th 357, 364 [construction of a statute is a pure question of law subject to independent review on appeal].) Because there is no dispute regarding the contents of the four emails in question or the fact that those documents were excluded from the rulemaking file, the independent standard of review also applies to the *application* of that statutory interpretation to the facts of this case. (*Twedt v. Franklin* (2003) 109 Cal.App.4th 413, 417.)

D.      Statutory Construction of Rulemaking Provisions

         1.      *General Principles*

Our independent determination of the meaning of sections 11347.3, subdivision (b) is guided by the following general principles of statutory construction.

A reviewing court's fundamental task in construing a statute is to determine the intent of the lawmakers so as to effectuate the purpose of the statute. (*Grayson Services, Inc. v. Wells Fargo Bank* (2011) 199 Cal.App.4th 563, 570; see Code Civ. Proc., § 1859 [in construing a statute, intention of Legislature is to be pursued].) Courts start this task by scrutinizing the actual words of the statute, giving them their usual, ordinary meaning. (*Grayson Services, Inc. v. Wells Fargo Bank*, *supra,* at p. 570.) When statutory language is clear and unambiguous (i.e., susceptible to only one reasonable construction), courts adopt the literal meaning of that language, unless that literal construction would frustrate the purpose of the statute or produce absurd consequences. (*Ibid*.)

Alternatively, when the statutory language is ambiguous, courts must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute. (*Grayson Services, Inc. v. Wells Fargo Bank*, *supra*, 199 Cal.App.4th at p. 570.) The interpretation of ambiguous wording is guided by the fundamental principle that courts construe those words in the context and with reference to the entire scheme of law of which they are a part. (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043; see *Schatz v. Allen Matkins Leck Gamble & Mallory LLP* (2009) 45 Cal.4th 557, 569 [every statute should be construed with reference to the whole system of law of which is it a part].) Courts resolving statutory ambiguity also may be aided by the ostensible objects to be achieved by the legislation, the evils to be remedied, the legislative history, and public policy. (*Honchariw v. County of Stanislaus* (2011) 200 Cal.App.4th 1066, 1073.) When a court interprets an ambiguous statute, it is not

authorized to rewrite the statute. It must simply declare what is, in terms or in substance, contained in the statute. (Code Civ. Proc., § 1858.) Court do not have the authority "to insert what has been omitted, or to omit what has been inserted" by the Legislature. (*Ibid.*)

### 2. *Constitutional Directive Concerning Disclosure*

In addition to the foregoing general principles of statutory construction, our interpretation of the APA must follow applicable constitutional directives. At the November 2, 2004, General Election, California voters adopted such a directive. (*Versaci v. Superior Court* (2005) 127 Cal.App.4th 805, 819, fn. 3.) They passed Proposition 59, known as the "Sunshine Initiative," which amended article I, section 3 of the California Constitution by adding subdivision (b). (*Versaci, supra,* at p. 819, fn. 3.) Subdivision (b)(1) states that the "people have the right of access to information concerning the conduct of the people's business .…" (Cal. Const., art. I, § 3, subd. (b), par. (1).) Subdivision (b)(2) is the particular provision that will affect our statutory interpretation in this case—it provides in pertinent part: "A statute, court rule, or other authority, including those in effect on the effective date of this subdivision, shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access." (Cal. Const., art. I, § 3, subd. (b), par. (2).)

Therefore, when a court is confronted with resolving a statutory ambiguity related to the public's access to information, the California Constitution requires the court to construe the ambiguity to promote the disclosure of information to the public.

### 3. *Contentions of the Parties*

Plaintiffs contend that the four emails should have been included in the rulemaking file because, among other things, they contain "data and other factual information" that was "submitted to the agency in connection with the adoption … of the regulation." (§ 11347.3, subd. (b)(6).)

ARB argues that (1) plaintiffs are raising this interpretation and application of the statute for the first time on appeal and (2) the emails contain opinions, not facts or data. In addition, ARB argues that the statutory phrase "submitted to the agency" limits the scope of section 11347.3, subdivision (b)(6) to items that come from external sources. Under this interpretation, items from ARB consultants would not be covered because the consultants are ARB agents and, thus, any item they present would be properly regarded as an internal item, not an item submitted to ARB from an outside source.

### 4. Scope of Issues Considered on Appeal

It is well established that appellate courts have the discretion to decide a question of law raised for the first time on appeal. (*Ward v. Taggart* (1959) 51 Cal.2d 736, 742.) Courts are more inclined to exercise this discretion and consider such legal issues where the public interest or public policy is involved. (*Resolution Trust Corp. v. Winslow* (1992) 9 Cal.App.4th 1799, 1810.)

In the instant case, the application of the provisions of section 11347.3, subdivision (b)(6) to the four emails presents questions of law because the facts are not in dispute. The contents of the emails appear on the face of the documents and the circumstances of their delivery to ARB, such as the time and the source, are not disputed. Furthermore, because of the public interest involved in the proper interpretation and application of the disclosure provisions of the APA, we will exercise our discretion and determine the legal issue whether the emails contain "other factual information" and thus should have been included in the rulemaking file pursuant to section 11347.3, subdivision (b)(6).

### 5. Meaning and Application of Section 11347.3, subdivision (b)(6)

Section 11347.3, subdivision (b)(6) requires the rulemaking file to include "[a]ll data and other factual information, any studies or reports, and written comments submitted to the agency in connection with the adoption … of the regulation."

The dispute regarding the meaning and application of subdivision (b)(6) of section 11347.3 concerns the phrases "other factual information" and "submitted to the agency." We will begin with the broader question, which involves the phrase "submitted to the agency" and whether materials sent to the agency by its hired consultants fall within the scope of that phrase.

Our first inquiry is whether the phrase "submitted to the agency" is ambiguous. We conclude that each party has set forth a reasonably plausible interpretation. On the one hand, it is possible to adopt the ordinary meaning of the words of the statute and conclude that professors and researchers at universities that are geographically separated from the agency's officer are outside the agency and, therefore, items they send to the agency are "submitted" to the agency. On the other hand, it is possible to use concepts of agency law and interpret the phrase to exclude emails from consultants based on the view that such emails are internal communications and an agency does not submit information or reports to itself. Because each of the competing interpretations is reasonable, we conclude the statute is ambiguous and, therefore, we will look beyond its text to determine the proper meaning.

Our examination of matters outside the text includes a consideration of the public policies implicated by the disclosure of material received by agencies from consultants. We, like ARB's supplemental brief, recognize the tension between the benefits of disclosure and the benefits of confidentiality. In essence, the question is whether California will have a more effective procedure for making administrative regulations if (1) the public has access to information from the agency's consultant or (2) that information is kept confidential. Balancing these conflicting policies of disclosure and confidentiality might have been a difficult task had the California voters not addressed the issue. The conflict between the public policies is resolved by applying the constitutional directive favoring public access to information. (Cal. Const., art. I, § 3, subd. (b), par. (2).)

Pursuant to the constitutional directive for public access and the disclosure of information, we interpret section 11347.3, subdivision (b)(6) to mean that emails from consultants to ARB were "submitted to the agency."

Next, we consider the meaning of the word "information" in the phrase "other factual information." (§ 11347.3, subd. (b)(6).) Webster's Third New International Dictionary defines "information" as "something received or obtained through informing: as a : knowledge communicated by others or obtained from investigation, study, or instruction b : knowledge of a particular event or situation : INTELLIGENCE, NEWS, ADVICES … c : facts or figures ready for communication or use as distinguished from those incorporated in a formally organized branch of knowledge : DATA …." (Webster's 3d New Internat. Dict. (1993) at p. 1160, col. 3.) The noun "advice," which appears in the definition of "information," is defined to include a "recommendation regarding a decision or course of conduct : COUNSEL …." (*Id.* at p. 32, col. 1.)

We conclude that the word "information" appearing in section 11347.3, subdivision (b)(6) should be given its ordinary meaning. We will not adopt a definition that narrows the disclosure of information to the public because such an interpretation would be contrary to the constitutional directive favoring public access to information. (Cal. Const., art. I, § 3, subd. (b), par. (2).)

Here, ARB has argued that the emails contain only the opinions of the consultants and, therefore, do not constitute "factual information." We disagree on both points and conclude that (1) the emails contain nonopinion information and (2) the fact that an expert holds a particular opinion is factual information that the public has an interest in knowing.

To illustrate, Plevin's March 17, 2009, email to ARB discusses the Woods Hole emission factors, their use in the GTAP model, and the Winrock data set. The email has

a subject line of "Comparison of emission factor tables" and included attachments described as "Woods Hole Emission Factors for GTAP v2.xlsx; ATT2144257.htm."[50] The second numbered point in the email states: "The new table includes a 10% adjustment across the board. See the 'cleaned up' spreadsheet, column J on the Woods Hole sheet." Plevin's assertion that the "new table contains a 10% adjustment across the board" constitutes "factual information" under the ordinary meaning of that term because the assertion conveys "knowledge of a particular event or situation." (See Webster's 3d New Internat. Dict. (1993) at p. 1160, col. 3 [definition of "information"].)

In addition, Plevin's email states that "these assumptions are not very solid," which is a reference to the "Woods Hole" data set used by ARB staff. This statement is a narrative of Plevin's opinion. From the perspective of the public, the fact that Plevin, an expert retained by ARB, held such an opinion is factual information.

Similarly, the three emails from Hertel contain "factual information" for purposes of section 11347.3, subdivision (b)(6).

Hertel's April 9, 2009, email regarding "LCFS Board Presentation" attached a PowerPoint document relating to the GTAP model and its use in policy analysis. Hertel's third numbered point in the email states: "I wish that ARB would make use of the confidence intervals that we have produced. Instead the final estimate is a rather arbitrary average across a set of model runs. This is much less defensible."

Hertel's assertions that ARB's "final estimate is a rather arbitrary average across a set of model runs" qualifies as "factual information" because it presents knowledge about a particular event—namely, how the estimate was created. (See Webster's 3d New

---

**50** The GTAP reference concerns the model ARB used to estimate land use changes cause by increased use of biofuels and the impact those changes would have on carbon emissions.

76.

Internat. Dict. (1993) at p. 1160, col. 3 [definition of "information" includes "knowledge of a particular event or situation"].)

In addition, Hertel's April 16, 2009, email discusses results for global land conversion generated by running his model assuming unchanging yields worldwide. Hertel asserted: "Previous scrutiny has brought down the yield response to higher prices as well (i.e. more recent studies of U.S. corn show a declining yield response)." Immediately following, Hertel cautioned: "But we know very little about yield response in the rest of the world." These statements provide the reader with knowledge about the operation of the GTAP model and the amount of information available concerning worldwide yield responses. As such, the statements convey "factual information."

Hertel's November 16, 2008, email was sent to ARB after he read a "Renewable Fuels Association report." Hertel stated that the report indicated that meeting the corn ethanol mandate would require only a few million hectares, which was "pretty much the same figure as we estimate, given that they are starting in 2007!" Hertel also stated: "Our analysis predicts very similar impacts on global land use—but shows that the emissions impacts are enough to rule out corn ethanol as a GHG reducing fuel." These statements provide the reader with knowledge about the operation of the GTAP model and the conclusions reached by an outside entity. Thus, they contain "factual information" for purposes of section 11347.3, subdivision (b)(6).

In summary, we conclude that the four emails contain factual information that was submitted to ARB. Accordingly, the omission of the emails from the rulemaking file was a violation of the APA. (§ 11347.3, subd. (b).)

### 6. *Relationship of Deliberative Process Privilege*

In closing this section of the opinion regarding the interpretation of section 11347.3, we note that our interpretation of provisions concerning the rulemaking file has no effect on (1) the scope of the deliberative process privilege or (2) how that privilege is

77.

applied. The inquiry into the disclosures required by the APA is analyzed separately from the question whether the deliberative process privilege applies to a particular document. Furthermore, the question regarding the application of the deliberative process privilege can be addressed before or after it is determined that the APA requires the public disclosure of a particular item.

Because the two issues are independent of one another, nothing in this opinion's interpretation of the APA should be read as vitiating or otherwise limiting the deliberative process privilege as it might be applied to materials delivered to public agencies by outside consultants or experts. Whether that privilege applies is determined on a case-by-case basis and the party claiming the privilege has the burden of presenting evidence to support the existence of the privilege. (See *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 307 [city failed to carry its burden of demonstrating the emails from consultants were protected by deliberative process privilege].)

Here, counsel for ARB stated during oral argument that ARB was not asserting that the four emails should have been excluded from the rulemaking file on the basis that the deliberative process privilege applied to them. Therefore, this opinion will not address any issues regarding the application of the privilege to the four emails excluded from the rulemaking file.

E.      Substantial Failure to Comply with APA

Pursuant to section 11350, subdivision (a), violations of the APA's rulemaking procedures justify declaring a regulation invalid only when the violation constitutes "substantial failure to comply with" those rulemaking procedures.[51]  In other words, a

---

[51]  The pertinent language from section 11350, subdivision (a) states:  "The regulation … may be declared to be invalid for a substantial failure to comply with this chapter .…"

failure to comply with every procedural facet of the APA does not automatically render a regulation invalid.  (*Pulaski v. Occupational Safety  & Health Stds. Bd.* (1999) 75 Cal.App.4th 1315, 1328 (*Pulaski*).)

The court in *Pulaski* addressed the meaning of the APA's "substantial failure to comply" language by quoting the following text from earlier cases:

> """"Substantial compliance, as the phrase is used in the decisions, means *actual* compliance in respect to the substance essential to every reasonable objective of the statute.' … Where there is compliance as to all matters of substance technical deviations are not to be given the stature of noncompliance. … Substance prevails over form."""" (*Pulaski, supra,* 75 Cal.App.4th at p. 1328.)

For purposes of this appeal, we will assume, without deciding, that the omission of each of the four emails adversely affected public participation and constituted a "substantial failure to comply with" the rulemaking procedures.  Based on this assumption, we will proceed to the appropriate remedy for the violations of the APA.

F.      Remedy for Violation of APA

The remedy for a violation of the rulemaking procedures of the APA is set forth in Government Code section 11350, subdivision (a), which provides:

> "Any interested person may obtain a judicial declaration as to the validity of any regulation … by bringing an action for declaratory relief in the superior court in accordance with the Code of Civil Procedure.…  *The regulation ... may be declared to be invalid for a substantial failure to comply* with [chapter 3.5 of the APA] .…"  (Italics added.)

The use of "may" in this statutory provision has been interpreted to mean that courts have the discretion to declare the regulation invalid, but are not required to do so. (*California Assn. of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286, 306.)

For example, in *Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324 (*Morning Star*), the California Supreme Court allowed a hazardous material fee program implemented in violation of the APA to remain in effect while the agency was

given a "reasonable opportunity to promulgate valid regulations under the APA." (*Id*. at p. 341.) The court selected this remedy based on its determinations that "the hazardous materials fee program is of critical importance to the State of California" and "any disruption in collection of the fee would seriously undermine the program." (*Id*. at p. 342.) *Morning Star* demonstrates that courts have the authority to implement a remedy less onerous than invalidation. In other words, courts are not limited to choosing between invalidation of the regulation and no remedy at all. Furthermore, when selecting an appropriate remedy for a procedural violation of the APA, courts may consider the public interests affected by the remedy.

As discussed below, we believe the public interest is not served by invalidating (i.e., suspending the operation of) the LCFS regulations. Instead, the purpose underlying the public disclosure of the contents in the rulemaking file can be accomplished on remand by requiring ARB to include the four emails in the rulemaking file and allowing the public to comment on those emails during the reapproval process that will be mandated to correct the CEQA violations.

VI. REMEDY

    A.    Judicial Remedies Under CEQA

The judicial remedies for a CEQA violation are governed by section 21168.9. That section was enacted in 1984 for the purpose of providing courts with some flexibility in tailoring the remedy to the specific CEQA violation. (*Preserve Wild Santee v. City of Santee, supra,* 210 Cal.App.4th at p. 288; *San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (2001) 89 Cal.App.4th 1097, 1103.) In 1993, section 21168.9 was amended to expand the authority of courts to fashion a remedy that permits a part of the project to continue while the agency seeks to correct its CEQA violations. (*Id*. at p. 1104-1105.)

*1.     Remedial Mechanism*

The mechanism through which the remedy or remedies are implemented is a peremptory writ of mandate.  Subdivision (b) of section 21168.9 provides that the court's "order shall be made by the issuance of a peremptory writ of mandate specifying what action by the public agency is necessary to comply with [CEQA]." The use of the word "shall" indicates that courts are *required* to order the issuance of a writ of mandate to remedy a failure to comply with CEQA.  (*LandValue 77, LLC v. Board of Trustees of California State University* (2011) 193 Cal.App.4th 675, 681 [statute's mandatory language requires issuance of writ of mandate to remedy CEQA violation].)  Therefore, the mechanism for implementing the appropriate CEQA remedy will be a writ of mandate issued by the superior court on remand.

*2.     Types of Remedial Action Included in the Writ*

The particular types of action that a court *may* order the agency to take are referred to as "mandates" by subdivision (a) of section 21168.9.  The three different types of "mandates" are identified by the statute.  The agency *may* be directed (1) to void, in whole or in part, a determination, finding or decision, (2) to "suspend any or all specific project activity or activities" if certain conditions exist, or (3) to take specific action necessary to bring the determination, finding or decision tainted by the CEQA violation into compliance with CEQA.[52]

---

[52]  The full text of subdivision (a) of section 21168.9 provides:

"(a) If a court finds, as a result of a trial, hearing, or remand from an appellate court, that any determination, finding, or decision of a public agency has been made without compliance with [CEQA], the court shall enter an order that includes one or more of the following:

"(1) A mandate that the determination, finding, or decision be voided by the public agency, in whole or in part.

"(2) If the court finds that a specific project activity or activities will prejudice the consideration or implementation of particular mitigation measures or alternatives to the

In the preceding paragraph, we have italicized the word "may" to emphasize our interpretation of the statutory language that states "the court *shall* enter an order that includes *one or more*" of the three different types of "mandates" listed in the statute. (§ 21168.9, subd. (a), italics added.) In our view, the statute's use of "shall" and "one or more" means that a court must choose at least one mandate, but has the discretion to choose (1) which one of the three mandates is appropriate and (2) whether additional types of mandates are included in the writ. (See *In re Jesusa V.* (2004) 32 Cal.4th 588, 622 [the ordinary and popular meaning of "or" is well settled; it is disjunctive].)

### 3. Limitations on Court's Discretionary Authority

Section 21168.9 also contains explicit limitations on the authority of courts to fashion a remedy.

First, the court's order "shall include only those mandates which are necessary to achieve compliance with [CEQA] and only those specific project activities in noncompliance with [CEQA]." (§ 21168.9, subd. (b).)

Second, "the order shall be limited to that portion of a determination, finding, or decision or the specific project activity or activities found to be in noncompliance only if a court" makes certain findings. (§ 21168.9, subd. (b).) Severance and a limited order are appropriate when the "court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with [CEQA], and (3) the court has not found the remainder of the project to be in noncompliance with [CEQA]." (§ 21168.9, subd. (b).)

---

project, a mandate that the public agency and any real parties in interest suspend any or all specific project activity or activities, pursuant to the determination, finding, or decision, that could result in an adverse change or alteration to the physical environment, until the public agency has taken any actions that may be necessary to bring the determination, finding, or decision into compliance with this division.

"(3) A mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division."

Third, a court is not authorized "to direct any public agency to exercise its discretion in any particular way."  (§ 21168.9, subd. (c).)

The foregoing limitations on the court's authority must not be interpreted to create implied limitations.  The legislative intent on this point is stated clearly:  "Except as expressly provided in this section, nothing in this section is intended to limit the equitable powers of the court."  (§ 21168.9, subd. (c).)

B.     Analysis

Our analysis of which "mandates" listed in subdivision (a) of section 21168.9 should be included in the writ issued to ARB begins with the basis proposition that the purpose of the "mandates" is to achieve compliance with CEQA.  This remedial purpose is evident in the text of subdivision (b) of section 21168.9, which states that the order granting relief "shall include only those mandates which are necessary to achieve compliance with [CEQA] .…"  (§ 21168.9, subd. (b).)

To achieve the remedial goal of compliance with CEQA, we must identify and address each failure to comply.  Restated in statutory terms, we must identify the "determination, finding, or decision [ARB] … made without compliance with [CEQA]."  (§ 21168.9, subd. (a).)  Once a failure to comply with CEQA has been identified, we will consider which mandate (or mandates) is "necessary to achieve compliance with [CEQA]."  (§ 21168.9, subd. (b).)

Here, ARB committed three violations of CEQA.  First, the Board prematurely approved the LCFS regulations at its public hearing on April 23, 2009, before the environmental review was completed.  That premature approval decided the controversial issue of whether the carbon intensity values to be assigned to ethanol pathways should be increased to account for indirect effects resulting from land use changes.  It also decided the amount of the increase—30 gCO2E/MJ for ethanol produced from corn and 46 gCO2E/MJ for ethanol produce from sugarcane.

Second, ARB improperly split the decisionmaking authority to approve the project from the responsibility for completing the environmental review. For instance, the Executive Officer completed the environment review by responding to the public comments directed at the carbon intensity values attributed to land use changes even though the Board previously determined those values.

Third, ARB deferred the formulation of mitigation measures for NOx emissions from biodiesel without committing to specific performance criteria for judging the efficacy of the future mitigation measures.[53]

### 1. Deferring the Formulation of Mitigation Measures

Subdivision (a)(1) of section 21168.9 authorizes this court to "mandate that the … decision be voided by the public agency, in whole or in part." Pursuant to this authority, we shall mandate that the decision to defer the formulation of mitigation measures be voided by ARB. Voiding this decision means that ARB must replace the defective decision with a new decision that complies with CEQA. The action ARB should take before making that new decision is addressed in parts VI.B.5 and VI.B.6 below.

### 2. Defective Approval

Because the approval of the project was a defective "decision," we are authorized to "mandate that [the project approval] be voided by [ARB], in whole or in part." (§ 21168.9, subd. (a)(1).) Directing an agency to void its approval of the project is a typical remedy in for a CEQA violation. (See 2 Kostka & Zischke, *supra*, § 23.124, pp. 1266-1267.)

Here, the "in whole or in part" language in the statute presents the question whether the project approval could be voided in part. It does not appear, however, that

---

[53] The "decision" to defer the formulation of mitigation measures might be a "determination" for purposes of section 21168.9. However, it does not appear that the distinction between a "decision" and a "determination" has any impact on our selection of the appropriate remedy.

ARB's decision to approve the project can be separated into a part that complies with CEQA (i.e., a part approved *after* the environmental review) and a part that does not comply with CEQA (i.e., a part approved *before* environmental review). Therefore, we conclude it is not appropriate to direct ARB to void its approval in part. As a result, we turn to the question whether to direct ARB to void the entire approval or whether to allow the approval to stand.

*Save Tara*, *supra*, 45 Cal.4th 116 is similar to the present case because it also involved a premature project approval. In *Save Tara*, the Supreme Court decided that the approval should be voided. In selecting this judicial remedy, the Supreme Court used mandatory language, stating it agreed "with the Court of Appeal that City must be ordered to 'declare void its approval of the May and August 2004 Agreements' and to reconsider those decisions in light of a legally adequate EIR for the project. (See § 21168.9, subd. (a)(1).)" (*Save Tara*, *supra*, 45 Cal.4th at p. 143.) The Supreme Court again used mandatory language when it framed its instructions for remand: "This matter therefore *must* be returned to the superior court for that court (1) to order City to set aside its prior approval of the project …." (*Ibid*., italics added.)

Whether voiding a defective project approval is mandatory or a matter of discretion is a question we need not decide because our choice of remedy is the same. Regardless of which rule of law applies, we conclude that the circumstances of this case justify an order directing ARB to set aside its approval of the LCFS regulations. Voiding the defective approval clears the way for ARB to implement an approval that complies with CEQA.

### 3. *Suspending the Operation of the LCFS Regulations*

The next question presented is whether voiding the defective approval automatically suspends the operation of the LCFS regulations. We conclude it does not.

For purposes of section 21168.9, the operation and enforcement of the LCFS regulations are not a "determination, finding, or decision" as that phrase is used in

subdivision (a)(1) of section 21168.9. Instead, the operation and enforcement of the LCFS regulations constitutes the "project activity or activities" as that phrase is used in subdivisions (a)(2) and (b) of section 21168.9. Under this statutory interpretation, whether to suspend the operation of the LCFS regulations is a separate question from whether to void the approval of the LCFS regulations. Furthermore, whether to suspend the operation of the LCFS regulations is answered by the application of subdivision (a)(2) of section 21168.9, not the provision that addresses voiding defective decisions. Therefore, our decision to void the premature approval of the LCFS regulations does not *require* us to suspend the operation of the regulations.

Another question of statutory interpretation is whether section 21168.9, either expressly or impliedly, prohibits courts from allowing a regulation, ordinance or program to remain in effect pending CEQA compliance. We have found no express prohibition. In addition, we conclude that such a prohibition should not be implied because section 21168.9, subdivision (c) states that the equitable powers of the court are subject only to limitations expressly provided in section 21168.9. We interpret the reference in subdivision (c) to "equitable powers" to include "the court's inherent power to issue orders preserving the status quo." (*Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, p. 341 (*Morning Star*).)[54] Thus, under section 21168.9, subdivision (c), courts retain the inherent equitable power to maintain the status quo pending statutory compliance, which permits them to allow a regulation, ordinance or program to remain in effect.

---

[54] In *Morning Star,* the Supreme Court referred to "the court's inherent power to issue orders preserving the status quo" as the basis for its order allowing a hazardous material fee program implemented in violation of the APA to remain in effect while the agency was given a "reasonable opportunity to promulgate valid regulations under the APA." (*Morning Star, supra,* 38 Cal.4th at p. 341.)

To summarize our statutory interpretation, we conclude that a court's decision to void the approval of a regulation, ordinance or program does not necessarily require the court to invalidate or suspend the operation of the regulation, ordinance or program. Instead, in extraordinary cases, the court may exercise its inherent equitable authority to maintain the status quo and allow the regulations to remain operative. The more common alternative is for the court to exercise its discretionary authority under section 21168.9, subdivision (a)(2) by suspending the operation of the regulation, ordinance or program.

How should the foregoing discretionary authority be exercised in this case? This issue—specifically, whether to suspend the LCFS regulations—is the most controversial issue regarding judicial relief presented in this appeal. Suspension of project activity is one of the three "mandates" available under subdivision (a) of section 21168.9 and subpart (2) of that provision addresses when suspension is appropriate. First, suspension requires a finding "that a specific project activity or activities will prejudice the consideration or implementation of particular mitigation measures or alternatives to the project …." (§ 21168.9, subd. (a)(2).) Second, the suspension appears to be limited to project activity "that could result in an adverse change or alteration to the physical environment …." (§ 21168.9, subd. (a)(2).)

Under the circumstances presented by the instant case, we find that allowing the LCFS regulations to remain in effect will not prejudice the consideration or implementation of mitigation measures or alternatives. The project is a written standard governing the conduct of third parties. Written standards, unlike projects involving construction of facilities, do not become part of the physical environment. Where facilities or structures are involved, their construction alters the physical environment and those physical changes may affect the mitigation or alternatives that remain feasible. For example, once a freeway interchange is built, it may not be feasible to lessen its adverse environmental impact by moving it to a better location. In contrast, when ARB is considering the reapproval of the project, the consideration of mitigation measures and

87.

alternatives will be essentially the same regardless of whether or not the LCFS regulations remain operative. In other words, it does not appear that suspending the operation of the LCFS regulations will open for consideration mitigation measures and alternatives that would have been infeasible without the suspension. Thus, we find that the prejudice referenced in subdivision (a)(2) of section 21168.9, is unlikely to result from allowing the LCFS regulations to remain in effect while the CEQA defects are cured.[55]

Subdivision (a)(2) of section 21168.9 also refers to suspending project activity "that could result in an adverse change or alteration to the physical environment …." This provision is related to the legislative intent that CEQA should be interpreted in a manner that affords the fullest possible protection to the environment within the reasonable scope of the statutory language. (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d 376, 390.) The statutory language and legislative intent indicates that, in exercising our discretion, we must consider the environmental effect of suspending the LCFS regulations. The inquiry into environmental effects is especially complex in this case because of the breadth of the LCFS regulations and its consequences. For instance, its impact on a wide range of air pollutants is not easily quantified. On balance, we conclude that the environment will be given greater protection if the LCFS regulations are allowed to remain operative pending ARB's compliance with CEQA. Specifically, the emissions of greenhouse gases will be

---

[55] Because we have made this finding, we need not remand this issue to the trial court, which was the course taken by the appellate court in *Californians for Alternatives to Toxics v. Department of Food and Agriculture* (2005) 136 Cal.App.4th 1. In that case, the appellate court vacated the certification of the EIR, but did not enjoin the department from engaging in activity under the Pierce's Disease Control Program addressed in the EIR. (*Id.* at pp. 21-22.) The appellate court directed the trial court, after notice and a hearing, to determine whether the application of pesticides under the program would prejudice the consideration or implementation of mitigation measures or alternatives to the project. (*Id.* at p. 22.)

less if the LCFS regulations are allowed to remain in effect, rather than being suspended. The possibility that the use of biodiesel will produce more NOx emissions than the petroleum-based diesel that it replaces does not justify throwing out the entire LCFS regulation.

Therefore, we conclude that the LCFS regulations should remain in operation so long as ARB is diligent in taking the action necessary bring its approval of the project into compliance with CEQA. This exercise of our discretionary authority, while unusual, does not contravene principles established in other published cases.

*County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544 (*County Sanitation*), is similar to the present case in that it concerned an ordinance adopted in violation of CEQA. The ordinance was designed to reduce the environmental impact resulting from the application of sewage sludge to agricultural land by requiring the sewage sludge be treated to heightened standards before its application to land. Thus, the ordinance is comparable to the LCFS regulations in that both were designed to regulate activity that could harm the environment. The CEQA violation in *County Sanitation* was more fundamental because it involved a failure to prepare the requisite environmental review document—an EIR.

In *County Sanitation*, like this case, we requested supplemental briefing regarding how to apply section 21168.9 and the directions to be given the superior court on remand. (*County Sanitation*, *supra,* 127 Cal.App.4th at p. 1604.) In that case, we asked the parties "whether the heightened treatment standard should be voided or allowed to remain in effect pending the completion of an EIR." (*Ibid*.) The parties responded by agreeing that the ordinance should remain in effect. (*Id*. at pp. 1604-1605.) Thus, the analysis we

adopted in *County Sanitation* is limited to situations where the parties agree to preserving the status quo, which is not the situation presented by the instant case.[56]

Besides *County Sanitation*, there do not appear to be many published California cases in which the appellate court allowed a regulation, rule, ordinance, general order or other type of written requirement governing third party action to remain operative pending the public agency's taking action necessary to achieve CEQA compliance.

In contrast, the California Supreme Court has set aside ordinances because of CEQA violations. (E.g., *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 196 [ordinance placed on ballot and approved by voters without CEQA compliance; "appropriate relief is invalidation of the ordinance"]; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 88 [city ordinances creating oil drilling districts required preparation of EIR; Supreme Court concluded "superior court shall set aside the ordinances"].) Similarly, a Court of Appeal decision upheld a trial court's decision to suspend an air quality rule pending completion of a new 30-day public comment period because the air quality management district failed to circulate a complete copy of its environmental review document before the close of the comment period. (*Ultramar, Inc. v. South Coast Air Quality Management Dist.* (1993) 17 Cal.App.4th 689, 698 [trial court suspended air quality rule 1410 pending reevaluation of the rule following a full 30-day public comment period].)

These cases, two of which were decided before the 1993 amendments to section 21168.9 became effective, do not compel the conclusion that regulations, rules or

---

**56** In *County Sanitation,* rather than automatically implement the parties' agreement, we tested their agreement against equitable principles, such as the public interests implicated by their choice of remedies. (*County Sanitation*, *supra,* 127 Cal.App.4th at p. 1605.) Because the parties' agreement did not harm the public interests at stake, we decided to allow the ordinance to continue in effect pending the county's compliance with CEQA. (*County Sanitation,* at p. 1605.)

ordinances adopted in violation of CEQA *must* be set aside pending CEQA compliance. Furthermore, even if the cases are regarded as creating a preference for a CEQA remedy that invalidates the regulations, rules and ordinances pending CEQA compliance, we conclude the circumstances of this case justify departing from that preference. Those circumstances include the probable impacts on the environment of allowing the written standards to remain in effect compared to the impact of setting the written standards aside.

In summary, we conclude the remedy of voiding the project approval does not require that operation and enforcement of the LCFS regulations be suspended pending ARB's compliance with CEQA. Furthermore, we conclude the LCFS regulations should remain in effect pending ARB's compliance with CEQA because the public interests at stake, which include the protection of the environment, weigh in favor of preserving the status quo.

### 4. *Corrective Action*

Subdivision (a)(3) of section 21168.9 authorizes this court to "mandate that the public agency take specific action as may be necessary to bring the determination, finding or decision into compliance with [CEQA]." One commentator has interpreted this language and the provisions of subdivision (b) of section 21168.9 as requiring courts to "rule on all alleged deficiencies so that the agency will know exactly what steps are necessary to bring its action into compliance with CEQA." (See 2 Kostka & Zischke, *supra*, § 23.125, p. 1271; see § 21005, subd. (c).)

Pursuant to the authority granted by subdivision (a)(3) of section 21168.9 we set forth the specific action ARB should take in the event it exercises its discretion in favor of reapproving the LCFS regulations or a modified version of those regulations. Because there are different routes by which ARB could achieve CEQA compliance, we will identify those routes and the decision by which a particular route is chosen.

91.

### 5. *Compliant Approval*

To bring the approval of the LCFS regulations (or a modified version of those regulations) into compliance with CEQA, the "approval" decision must be made by a decision maker with the responsibility for completing environmental review after that decision maker has completed the environmental review. Consequently, the Board first must identify a decision maker and make sure that the decision maker has full authority to (1) complete the required environmental review and (2) approve or disapprove the project. It appears the two most likely decision makers in this case are the Board and the Executive Officer. If the Board designates the Executive Officer as the decision maker, it must (1) give the Executive Officer full authority to approve or disapprove every aspect of the regulations and (2) direct him or her to exercise that authority only after completing the environmental review.

### 6. *Compliant Environmental Review*

One of the specific problems created by ARB's 2009 approach to the approval of the LCFS regulations was that the transfer of authority to the Executive Officer effectively precluded the Executive Officer from analyzing and revising the carbon intensity values assigned to ethanol to account for indirect effects caused by land use changes. As a result, when the Executive Officer responded to comments regarding the carbon intensity values attributed to land use changes, the Executive Officer was simply providing a post hoc rationalization for a decision about carbon intensity values already made by the Board. (See *Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 47 Cal.3d at p. 394.)

The carbon intensity values attributed to land use changes by the Board also are related to the consultant emails omitted from the rulemaking file in violation of the APA. Those emails concerned the operation of the GTAP model—the model used to calculate land use changes and the indirect carbon emissions attributable to biofuels to account for those land use changes. The exclusion of those emails from the rulemaking file

precluded the written comments submitted before the April 23, 2009, public hearing from using information in the emails in formulating challenges to the use of the GTAP model and the carbon intensity values attributed to land use changes.

Therefore, to assure that any subsequent environmental review conducted by ARB's decision maker occurs prior to the "approval" of the LCFS regulation and any final decision regarding the carbon intensity values attributed to land use changes, we will direct that the issue of the land use changes (which includes, but is not limited to, issues involving the application of the GTAP model) be reopened and the public allowed to comment on the issue. The reopening of the issue of the carbon intensity values attributed to land use changes and allowing public comment also will serve to remedy ARB's violation of the APA by omitting consultant emails regarding the GTAP model from the rulemaking file.

With regard to ARB's errors in addressing the emissions of NOx resulting from the use of biodiesel, compliance with CEQA might be achieved by different routes. (See part VI.B.5, *ante*.)

This court will not set forth specific requirements for the timing of the reproposal of the LCFS regulations because ARB should be allowed the option of coordinating the reconsideration and potential reapproval with any other actions that it might take regarding the regulations. Consequently, we will direct ARB to file an initial return reporting to the superior court the steps and schedule it proposes to take to comply with the writ of mandate. (See 2 Kostka & Zischke, *supra*, § 23.125A, p. 1273 ["initial return describing the action [the agency] will take to comply" is usual practice].) The use of the initial return might allow some objections to be resolved before ARB proceeds with its corrective action.

## DISPOSITION

The judgment is reversed and the matter remanded for further proceedings. The superior court is directed (1) to vacate its decision denying the petition for writ of

93.

mandate and granting the Air Resources Board's motion to strike and (2) to enter a new order that (a) denies the motion to strike and (b) grants the petition for writ of mandate.

The superior court shall issue a peremptory writ of mandate that compels the Air Resources Board to take the following action:

(1) Set aside its approval of the LCFS regulations, including Board Resolution 09-31, dated April 23, 2009; Executive Order R-09-014, dated November 25, 2009; Executive Order R-10-003, dated March 4, 2013; and ARB's decision to defer the formulation of mitigation measures relating to NOx emission from biodiesel.

(2) The Air Resources Board shall (a) select a decision maker, (b) take such action as may be necessary to assure that the decision maker has full authority to approve or disapprove the proposed LCFS regulations and to complete the environmental review, and (c) take such action as may be necessary to assure the decision maker does not approve the proposed LCFS regulations until after the decision maker has completed the environmental review.

(3) Address whether the project will have a significant adverse effect on the environment as a result of increased NOx emissions, make findings (supported by substantial evidence) regarding the potential adverse environmental effect of increased NOx emissions, and adopt mitigation measures in the event the environmental effects are found to be significant.

(4) Allow public comments for a period of at least 45 days on all issues related to the approval of the proposed LCFS regulations (which shall include, without limitation, issues concerning (a) the carbon intensity values attributed to land use changes, (b) the application of the GTAP model, and (c) any new material in any supplemental staff report prepared in connection with the proposed LCFS regulations) and respond to those comments before approving the proposed LCFS regulations.

(5) Include the four emails in question in its rulemaking file.

(6) Preserve the status quo by continuing to adhere to the LCFS regulations standards in effect for 2013 until the corrective action is completed. Notwithstanding the directive herein that ARB set aside its prior approvals of the LCFS regulations and related resolutions and orders, the LCFS regulations shall remain in operation and shall be enforceable unless its operation is suspended as provided below.

The superior court shall retain jurisdiction over the proceedings by way of a return to the writ. The superior court shall require ARB to file an initial return no later than 30 days after issuance of the writ. The initial return shall explain what action ARB will take to satisfy the writ's requirements; this explanation shall include a schedule and shall identify who will act as the decision maker. Within 15 days of the filing of the initial return, plaintiffs may file a response, which shall include plaintiffs' objections to matter addressed in the initial return. If plaintiffs file a response, ARB's reply shall be due no later than 15 days after the response.

As to the filing of the final return and the corrective action taken pursuant to this writ, the superior court shall require ARB to proceed in good faith without delay. In the event ARB fails to proceed in good faith with diligence, the superior court immediately shall vacate the portion of the writ that preserves the status quo and shall direct ARB to set aside the LCFS regulations (i.e., suspend the operation and enforcement of the regulations).

Costs on appeal are awarded to plaintiffs.

_____<br>
Franson, J.

WE CONCUR:

_____<br>
Wiseman, Acting P.J.

_____<br>
Kane, J.